702 F.Supp. 1140 (1988)
B.G., by his Guardian Ad Litem, F.G., Plaintiff,
v.
CRANFORD BOARD OF EDUCATION, Defendant.
CRANFORD BOARD OF EDUCATION, Plaintiff,
v.
B.G., by his Guardian Ad Litem, F.G., Defendant.
Civ. A. Nos. 87-1360, 87-4745.
United States District Court, D. New Jersey.
November 18, 1988.
As Amended December 29, 1988.
*1141 Weinberg & Kaplow, P.A. by Richard J. Kaplow, Springfield, N.J., for plaintiff.
Theodore A. Sussan, Spotswood, N.J., for defendant.

OPINION
WOLIN, District Judge.
Currently pending before this Court are two related actions arising under the Education for All Handicapped Children Act ("EAHCA"), P.L. 94-142, 20 U.S.C. § 1400 et seq., consolidated for trial and requiring review of an Order issued by an Administrative Law Judge ("ALJ") determining that the subject child ("B.G.") be placed in a year-round residential program approved by the State of New Jersey for emotionally disturbed students. Ancillary to this determination is the issue of reimbursement for prior program placement. The order of the ALJ directing that B.G. be placed in a residential placement is affirmed. The issue of reimbursement is reserved and shall be the subject of a supplementary opinion.

I. PROCEDURAL HISTORY
The procedural history of this case is fully documented in two decisions by Edith Klinger, an Administrative Law Judge of the State of New Jersey. Her initial Opinion, dated December 10, 1986, concluded that B.G. should be classified as emotionally disturbed and directed that the Cranford Child Study Team ("CST") consider an appropriate placement for him, including the Youth Behavior Program ("YBP") located in Colorado. At the time of this decision, B.G.'s parents had voluntarily placed him at YBP and the ALJ continued this placement until the CST developed a suitable Individualized Education Program ("IEP") and placement for him. Parental reimbursement for YBP placement was left to the parties to resolve. This issue, which the parties were unable to settle, as well as the issue of counsel fees arising from these proceedings, still remain in dispute.
The second Opinion, issued on September 30, 1987, ordered that B.G. be placed in a year-round residential program approved by the State of New Jersey for emotionally disturbed students and that the Cranford Board of Education ("Board") pay for B.G.'s associated costs as enumerated in the Opinion. The ALJ further decided that *1142 YBP was an inappropriate placement and that therefore B.G.'s father ("F.G.") was not entitled to reimbursement for placing B.G. in that program.
The two prior ALJ Opinions are incorporated herein by reference, thereby obviating the need to further amplify the procedural history.

II. FACTUAL BACKGROUND
B.G., currently 14 years old, was adopted by F.G. and his wife ("the F.G.'s") when he was four and one-half years of age. He is one of three Korean children adopted by the F.G.'s. Two younger female children complete the family unit. In sequence of adoption B.G. is the middle child.
When adopted, B.G. showed signs that he had previously been physically abused, malnourished and abandoned in his native Korea. Initial episodes of screaming and temper tantrums escalated into angry, hostile and provocative acts as he advanced in age. Early on, the F.G.'s noticed that he was distrustful, unaffectionate, uncommunicative and unwilling to accept responsibility for acts of negative conduct. Frequently, he lied about occurrences that ultimately were proven to have been committed by him. Disobedience to his mother, hoarding of food in his room, theft of money from his father, harassment of his sisters and the setting of minor fires when angry depict the type of conduct that undermined the peace and tranquility of the F.G. home.
His school adjustment was also fraught with difficult circumstances. Learning ability was seriously impeded by easy distraction and a short attention span. He constantly had to be refocused to his assigned task. Peer pressure and troubled peer relationships caused B.G. to frequently engage in disruptive behavior through the hitting, tripping or kicking of another child. Notwithstanding a succession of educational placements in both the public and private sector, B.G.'s school behavior profile remained the same.
When B.G. was in the fifth grade at St. Michael's, a parochial school, F.G. determined that he was not learning and sometime in October 1985 transferred him, against B.G.'s wishes, to Cranford's Brookside School. His fifth grade teacher, Greta Sobelson, after a period of observation, suggested that the F.G.'s seek the assistance of a counselor. They contacted Dr. Leonard Volenski, a certified school psychologist and a licensed clinical psychologist. From December 1985 until June 1986 Volenski saw B.G. on a weekly basis. Volenski advised the F.G.'s that in his opinion B.G.'s school problems were related to underlying emotional problems. He found B.G. to be a very depressed child who had experienced a great deal of rejection in his life and who suffered from an attachment disorder stemming from B.G.'s abandonment by his natural parents. During his testimony before Judge Klinger on October 23, 1986, Dr. Volenski characterized B.G. as an emotionally disturbed child with a primary diagnosis of an intentional deficit disorder and a secondary diagnosis of a developmental disorder tracing back to B.G.'s early childhood. He further testified that B.G.'s emotional problems exacerbated the perceptual problems associated with his inadequate attention span. Volenski concluded that the most appropriate classification for B.G. was Emotionally Disturbed ("E.D.") and that the least restrictive program would be a residential setting. This opinion was bottomed on the theory that the selected program must be all-inclusive, thereby encompassing B.G.'s living needs and addressing his emotional and perceptual problems. Volenski rejected a day setting program because "I think B.G.'s emotional problems will tend to interfere with his learning process until he finds a setting that deals with the emotional problem."
Despite his opinion as to the need for a residential placement, Volenski recommended that F.G. place B.G. with the Youth Behavior Program in Colorado, since it was the only program of which he was aware that addressed attachment disorders of Korean children. Since YBP, in Volenski's opinion, dealt with both the home and school environment, he considered it as "the most appropriate placement." Volenski was particularly impressed with its *1143 therapeutic approach through trained surrogate parents, utilization of a contained classroom for emotionally disturbed children, outside therapy, and inclusion of the F.G.'s through a parent training program. YBP's establishment of limited and long-term goals seemed to Volenski a reasonable approach and, together with the other enumerated facets of the program, was the reason he recommended it to the F.G.'s.
Volenski made two other critical observations in his testimony: first, that B.G.'s educational and emotional needs were inseparable in terms of program placement; and second, that the CST's recommendation that B.G. be classified Perceptually Impaired ("P.I.") was inappropriate since it ignored B.G.'s emotional disturbance.
During Volenski's therapeutic intervention with B.G., he was alerted to certain death wish ideation that led him to believe that B.G. was potentially suicidal. This focus, together with B.G.'s anger, depression and withdrawal, obliged Volenski to refer B.G. for a psychiatric evaluation in order to determine possible psychiatric factors relating to B.G.'s behavioral problems.
On March 24, 1986, Dr. Felicia Oliver-Smith, a duly licensed psychiatrist, interviewed B.G. Her psychiatric evaluation confirmed for the F.G.'s the earlier observations of Volenski. Oliver-Smith concluded that B.G. "appears to be a multi-handicapped individual with neurological dysfunction, emotional disturbance and social maladjustment." She recommended a residential placement with family and individual therapy due to the unremitting difficulties between B.G. and his parents, particularly his mother. As an interim plan, Oliver-Smith suggested Woodbridge Child Diagnostic Center in order to get a better diagnostic picture of B.G. outside the home. Through this type of evaluation, she reasoned, the most appropriate placement could be determined for him.
On February 27, 1986, while Volenski was treating B.G., F.G. requested, in writing, a CST evaluation. At that time B.G. was at the Brookside School in a normal fifth grade placement. His assigned teacher was Sobelson. The evaluation commenced in March 1986 though Sobelson, according to the school principal, thought it premature.
A CST evaluation is comprised of three components representing various disciplines integral to the educational process. They include the social, learning disability and psychological aspects of a student's profile. Each discipline is represented by a certified trained professional who prepares a report. Subsequent to the completion of their reports they meet ("staffing") and discuss their findings preliminary to the preparation of a conference report containing a classification and an IEP. A CST conference with the parents follows the report preparation.
B.G.'s Child Study Team consisted of Bridget DePinto, a School Social Worker, Ethel White, a Learning Disability Teacher Consultant ("LDTC"), and Robert Hegedus, a Certified School Psychologist. DePinto was in charge of preparing the CST report. Her social evaluation consisted of a home interview, two observations of B.G. in class, a conference with Sobelson and a review of outside consultant reports. At the home interview on March 12, 1986, the F.G.'s demonstrated great concern as to B.G.'s home behavior and its impact on existing family relationships. Mrs. F.G. was distraught and confided that she had done everything she could do. Though the negative characteristics of B.G.'s personality dominated the interview, F.G. did stress that "He's a nice boy. He's not mean, he doesn't do mean things to other boys or other girls."[1]
In May 1986, White tested B.G., spoke with Sobelson and also spoke with B.G.'s comp-ed teacher. White's duty as the LDTC is to determine how a child functions *1144 in a classroom and to evaluate the child's overall level of classroom performance.[2] Hegedus's input consisted of performing other tests and a comp-ed observation and holding discussions with the school's psychiatric consultant, Samuel Levine, M.D.
Meanwhile, as other reports were being prepared, Sobelson, in two reports dated February 28, 1986 and April 11, 1986, advised the CST that B.G.'s personal and social behavior in class was very poor. He experienced problems in social interaction with his peers and was difficult to deal with.[3] Her April report characterized B.G.'s personal and social behavior as "[v]ery, very poor." (emphasis added).
When DePinto summoned the CST for staffing on May 19, 1986, the information available consisted of reports prepared by DePinto, White, Hegedus, Dr. Vicci[4] (an optometrist), the outside consultant reports of Volenski, Oliver-Smith and Dr. Gold,[5] and the written observations of Sobelson. Additionally, Hegedus had spoken to both Levine and Volenski. Present were the CST members, Sobelson and the school principal, Mr. Mandel. After a review of all of these materials, the CST concluded that a classification of Perceptually Impaired was appropriate. Each member of the CST testified that prior to the staffing, none of them had a preconceived notion as to the proper educational handicap classification of B.G. DePinto said all reports were considered and evaluated as to their relevance in the educational setting. In discussing the reports of Volenski, Oliver-Smith and Gold, she commented that the behavior in those reports was not the behavior the CST observed in the classroom setting. Thus, an E.D. classification was determined to be inappropriate. Hegedus, in his testimony, further elaborated that the Volenski and Oliver-Smith reports followed a medical model and did not focus sufficiently on B.G. in the classroom setting. He was satisfied, as a Certified School Psychologist, that such reports dealt with emotional difficulty in the home environment and had no impact in the educational setting. In his opinion, a P.I. classification was conducive to meeting B.G.'s educational needs and a proposed YBP placement was therefore not in B.G.'s best interest.
After determining the P.I. classification, an IEP was developed for B.G.[6] It consisted of the following:
1. Transfer to Orange Avenue School.
2. Assignment to a self-contained classroom staffed by a certified teacher of the handicapped, and a teacher's aide.[7]
3. Individualized instruction and mainstreaming as to non-academic curricula.
4. Participation in a school swimming program.
With the classification decided and the IEP developed, DePinto proceeded to have the conference report and IEP finalized in preparation for a meeting with the F.G.'s.
*1145 In the latter part of May 1986 the F.G.'s met with the CST. Though F.G. was cynical about B.G. receiving a fair evaluation "when the bucks are on the line and somebody has to pay for it", both he and his wife were relatively optimistic that B.G. was going to be classified as E.D. DePinto had been attentive, sympathetic, and reassuring in her contacts with the F.G.'s and requested input from them as to potential placements for B.G.[8]
Volenski attended the conference with the F.G.'s. Much to their collective surprise, B.G. was classified as P.I. The F.G.'s were aghast and after listening, left in "absolute, total, sheer disgust" because F.G.'s worst fears had been realized.[9] He characterized the CST conference as an "absolute, positive charade" and attributed the recommendation to "nothing more than a school board fearful that they were going to have to pay for a kid to go to a special treatment center and they didn't want to fund it."
The F.G.'s did not sign the IEP as this would have indicated acceptance of the classification and program recommended by the CST. Each left with a copy of it with the understanding they would be provided an opportunity to study the report and reconvene the CST after digesting it. On June 6, 1986 F.G. advised the Child Study Team by letter that he refused to consent to the proposed IEP. F.G. viewed any further contact or effort to request a different placement as a "waste of time." The F.G.'s made no attempt to contact William Cashman, the school district Director of Special Services, nor did they request a CST follow-up meeting.
In advance of the CST meeting in late May, the F.G.'s had been gathering literature on potential placements for B.G. By chance circumstance, F.G.'s brother called his attention to YBP, a program located in Colorado that specialized in attachment disorders. F.G. received the literature and shared it with both Volenski and Hegedus. Volenski recommended it. Hegedus thought it was not in B.G.'s best interest. By the first week in June, the F.G.'s had determined to place B.G. in YBP if a space became available.[10] F.G. was resigned to paying B.G.'s monthly costs of approximately $2,000.00 but hoped to be eventually reimbursed if he were successful in future litigation pertaining to B.G.'s status as E.D. YBP was not then, and is not now, on the approved list maintained by the New Jersey Department of Education.
YBP notified F.G. that there was a potential opening for placement of B.G. On June 15, 1986, F.G. and his family traveled to Evergreen, Colorado. B.G. was conditionally accepted subject to two weeks of family therapy in advance of formal acceptance. At the end of June, B.G. was formally accepted into YBP and the F.G.'s returned home.
On June 10, 1986, the Cranford Board of Education requested a due process hearing under N.J.A.C. 6:28-2.7 because of the refusal by the F.G.'s to consent to the initial placement. Thereafter, the Department of Education held a settlement conference on July 10, 1986, which was unsuccessful. September 22, 1986 was then assigned as a peremptory hearing date. On request of the Commission of Education, an ALJ was assigned to hear the matter of classification and appropriate placement. Hearings were held on September 22, 23 and 24, October 23 and November 20, 1986. The ALJ rendered her decision on December 10, *1146 1986 and found that B.G. should be classified as E.D. Since the CST had mistakenly classified B.G. as P.I. and had not focused on his placement in a program placement appropriate for E.D., the ALJ ordered the CST to consider appropriate placements for B.G., including YBP.[11] She ordered B.G.'s continued placement at YBP until the Child Study Team had the opportunity to develop a suitable IEP and placement for him. The ALJ did not retain jurisdiction.[12] Her decision was final pursuant to 20 U.S.C.A. § 1415(e) and neither party appealed.
While the due process hearing was ongoing and after its conclusion, B.G. was participating in YBP and also attending the sixth grade in the Jefferson County Public School system ("Jefferson").[13] At Jefferson he did not receive special education service assistance; he was "main-streamed"[14] and unclassified. However, individual therapy and group therapy were provided to B.G. by the school psychologist on a weekly basis. Some confusion exists as to whether B.G. was in fact classified as Emotionally and Behaviorally Disturbed ("EBD") as well as the basis for his receiving school psychological services as an unclassified student. Documentary evidence supplied by Jefferson appears to support the conclusion that B.G. was in fact unclassified and not enrolled as a special education student.
During January 1987, Cashman and Hegedus, in an effort to comply with the ALJ's order to develop a suitable IEP and placement for B.G., contacted Jefferson. Each learned that B.G. was being main-streamed and was not receiving special education service assistance. They were particularly surprised, in light of their prior IEP recommendation, that he was not receiving self-contained classroom assistance. Hegedus also sought information from a program called SCRIPT, which references all day and residential placements throughout New Jersey and surrounding states.[15] Also, Cashman had received a letter from Eileen Ware, an employee of the State Department of Education, dated February 10, 1987, advising that YBP was not on the Department's approved list and that in her opinion YBP was not an educational program. Accordingly, the Youth Behavior Program was not considered by the CST as an appropriate placement for B.G., despite the ALJ's order.
The CST held another preliminary planning staffing conference, considering the following information: reports from B.G.'s previous staffing (when he was classified as P.I.), B.G.'s current status in Jefferson, Ware's letter and Hegedus's SCRIPT information. There had been no updated contact and retesting of B.G., no further contact with the F.G.'s, and no current contact with YBP officials. Also, Jefferson's IEP and B.G.'s current report card were missing.
At the staffing conference the CST concluded that the most appropriate educational program for B.G. in the least restrictive environment would be one that retained him in the district. The recommended IEP provided for:
*1147 1. Regular sixth grade placements (mainstream);
2. Daily resource room referral for one period to develop his organizational and study skills;
3. Counseling with the school psychologist on Monday mornings for approximately one hour;
4. Availability of an E.D., self-contained classroom, if required, for a "time-out."[16]
In adopting this program, the CST reasoned that the Jefferson program could be duplicated in Cranford, since B.G. was mainstreamed, unclassified and not provided resource room access. They felt that the psychological component could be replicated through Hegedus, who could counsel B.G. on his attachment disorder. Members of the CST expressed their view that if their IEP was inadequate it could be supplemented or changed, but that it should be tried before its lack of success was judged. DePinto testified "that a program was not written in stone." At the time of their recommendation, the CST members were aware of other district programs that they felt would be more restrictive.[17] In their opinion, B.G.'s behavior pattern did not merit consideration of these programs and in fact Hegedus did not view B.G. as severely emotionally disturbed.
Having arrived at its recommendation, the CST held a planning conference with the F.G.'s on February 12, 1987. The CST presented its revised program and placement. There was no discussion of alternatives. The F.G.'s, upon request, were given a copy of the program and left. Unlike the initial planning conference, which consumed one and one-half to two hours, this one lasted 10 to 12 minutes. Cashman, who was also in attendance, was of the opinion that the F.G.'s would not accept the CST recommendation, since the F.G.'s thought YBP was the only appropriate placement. YBP placement was a program the CST was unwilling to recommend. Hegedus testified that money was not an issue in considering an appropriate placement to meet B.G.'s educational needs.
On February 25, 1987 the F.G.'s requested a due process hearing. Another unsuccessful settlement conference between the parties occurred on April 1, 1987. ALJ Klinger was reassigned to hear the matter and August 10, 11 and 12, 1987 were scheduled as peremptory hearing dates. The ALJ, in her opinion dated September 30, 1987, decided that B.G. required year-round residential placement for educational purposes and that such a placement would be the least restrictive environment. A conforming order was entered implementing her decision. She also determined that YBP was not an appropriate placement and that F.G. was not entitled to reimbursement for placing B.G. in that program. Once again, as in the prior litigation, the ALJ's decision was final and pursuant to 20 U.S.C. § 1415(e)(2) appealable by filing a complaint and bringing a civil action either in the Superior Court of New Jersey or in a District Court of the United States. The Board filed a complaint in the Superior Court of New Jersey, Docket No. L96384-87. F.G. had the action removed to this Court and consolidated with F.G.'s prior action for counsel fees. In his answer and counterclaim, F.G. concurred with the ALJ's decision except as to her legal conclusion that he is not entitled to reimbursement for YBP placement costs. F.G. also seeks reimbursement for proper and necessary costs associated with this litigation and an award of reasonable counsel fees.

III. DISCUSSION

(A) Legal Standards

The Education of All Handicapped Children Act is a comprehensive handicapped educational plan. See generally Board of Education v. Rowley, 458 U.S. 176, 179-84, 102 S.Ct. 3034, 3037-39, 73 *1148 L.Ed.2d 690 (1982). In order for a state to receive federal assistance under the Act, the state must provide all handicapped children, at public expense, with a "free appropriate public education," 20 U.S.C. § 1412(1) & (2). As defined in the Act, a "free appropriate public education" includes "special education" and "related services," id. § 1401(16)-(18), as necessary to "meet the unique needs of the handicapped child," Rowley, 458 U.S. at 188-89, 102 S.Ct. at 3042. Under the EAHCA, Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education. Rowley, 458 U.S. at 200, 102 S.Ct. at 3048. An important aspect of the EAHCA is the requirement of an Individualized Education Program tailored to the unique needs of the handicapped child. Id. at 181-82, 102 S.Ct. at 3038. As Justice Rehnquist observed: "Implicit in the congressional purpose of providing access to a `free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." Id. at 200, 102 S.Ct. at 3048. Access to specialized instruction, along with related services that are individually designed to provide an educational benefit to the handicapped child, represents the "basic floor of opportunity" available under the Act. Id. at 201, 102 S.Ct. at 3048. New Jersey, as a recipient of federal financial assistance under the EAHCA, has enacted regulations that assure all handicapped children the right to such a "free appropriate public education." N.J.A.C. 6:28-1.1, et seq.
The interstitial detail of the EAHCA is reserved to the states, who have the right to exceed the federal minimum standards and provide greater protection and services for handicapped children. Town of Burlington v. Department of Education, 736 F.2d 773, 785 (1st Cir.1984), aff'd sub nom. School Committee v. Department of Education, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). New Jersey has implemented the EAHCA through an array of statutes, N.J.S.A. 18A:46-1 to -46, and regulations promulgated by the State Board of Education under its "broad legislative rule-making powers." Geis v. Board of Education, 774 F.2d 575, 578 (3d Cir.1985) (quoting D.S. v. Board of Education, 188 N.J. Super. 592, 598, 458 A.2d 129, 133, certification denied, 94 N.J. 529, 468 A.2d 184 (1983)).[18] By such enactments, New Jersey has chosen to impose a higher standard of special education than that required by the EAHCA. Geis, 774 F.2d at 583. As noted by Judge Gibbons in Board of Education v. Diamond, 808 F.2d 987, 992 (3d Cir.1986), local school boards are required to provide educational services according to how the student can best achieve success in learning; despite any amendment to former N.J. A.C. 6:28-2.1, no agency statement indicates an intention to lower expectations for educating disabled children. 16 N.J. Reg. 1982 (December 5, 1983). Permitting children the fullest opportunity to develop their intellectual capacities is consistent with the New Jersey legislative findings in N.J.S.A. 18A:46-19.1; see Geis, 774 F.2d at 582.
This Court is called upon to make an independent determination of the appealable issues before it, after giving due weight to the administrative proceedings. Geis, 774 F.2d at 583. Such a review, however, is not an invitation for this Court to substitute its own notions of sound educational policy for those of the school authorities. Rowley, 458 U.S. at 206-07, 102 S.Ct. at 3051. As set forth in 20 U.S.C. § 1415(e)(2), the starting point of review is this Court's receipt of the record of the administrative proceedings, followed by the hearing of additional evidence. Thereafter, applying a preponderance of the evidence standard, this Court shall grant such relief as it determines is appropriate. This standard of review is now well settled. Wexler v. Westfield Board of Education, 784 F.2d 176, 180 (3d Cir.), cert. denied, 479 U.S. *1149 825, 107 S.Ct. 99, 93 L.Ed.2d 49 (1986). Thus, the Court's inquiry is twofold: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" Rowley, 458 U.S. at 207, 102 S.Ct. at 3051.
In evaluating an IEP under the Act generally, the Court, in making its independent determination, may give the ALJ's findings such weight as it deems proper. In light of the agency's expertise, the Court must at least consider the ALJ's findings, though it is free to accept or reject the findings in part or in whole. Burlington, 736 F.2d at 791-92. In the instant case, however, the ALJ has determined that the IEP is invalid because it has not met the state's requirements pertaining to a free appropriate public education for B.G. In such a situation, the Court "should be more circumspect about its intrusion. It is hard to locate a significant federal interest in displacing a state agency's supportable ruling that one of its school systems has not complied with state standards." Id. at 792 (footnote omitted). Thus, an intrusion on the ALJ's findings would be warranted only if they are contrary to established state law. Id. at 792 & n. 23.
Neither party disputes that the EAHCA specially provides for residential placement when merited. In Kruelle v. New Castle County School District, 642 F.2d 687, 692 (3d Cir.1981), the court pointed to specific provisions of the EAHCA authorizing residential placement. 20 U.S.C. §§ 1401(16) & 1413(a)(4)(B). Moreover, the court explained that the regulations under the EAHCA explicitly contemplate residential placement. The federal regulations provide:
If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child.
Comment. This requirement applies to placements which are made by public agencies for educational purposes, and includes placements in State-operated schools for the handicapped, such as a State school for the deaf or blind.
45 C.F.R. § 121a.302 (quoted in Kruelle, 642 F.2d at 692).
The New Jersey Administrative Code provides that each district board of education shall provide a free, appropriate public education program and related services for handicapped pupils in the least restrictive environment. N.J.A.C. 6:28-1.1(d). For some pupils a residential placement may well be the least restrictive. Geis, 774 F.2d at 583. Thus, the least restrictive environment depends upon the particular disability in question. Diamond, 808 F.2d at 992. Hence, the term "least restrictive environment" means the least restrictive environment in which educational progress, rather than educational regression, can take place. Id.

(B) Evidence Before the ALJ

The ALJ has issued two opinions in regard to B.G. Each opinion found the CST's IEP to be inappropriate for B.G.
The initial IEP classified him as P.I. despite unequivocal testimony from Volenski, B.G.'s therapist, that B.G. was an emotionally disturbed child whose emotional problems will tend to interfere with his learning process until he finds a setting that deals with his emotional problem. Volenski voiced his opinion that the least restrictive program for B.G. would be a residential setting. Only through such an all-inclusive program, encompassing his living needs, could B.G. address his emotional and perceptual problems. Dr. Oliver-Smith, a psychiatric consultant, evaluated B.G. and diagnosed him as a multi-handicapped individual; she recommended a residential placement for B.G. Then Dr. Gold, a pediatric neurologist with impeccable credentials, concluded that B.G. could not be managed at home even with weekly psychotherapy. In his opinion B.G. required a residential therapeutic program. Even Dr. Levine, the Board's psychiatric consultant, *1150 characterized the reports of Volenski and Oliver-Smith as excellent and was unable to add anything to them from a psychiatric point of view.
When the CST held its initial staffing, the members rejected the outside consultant reports as inconsistent with the behavior the Team members observed in the classroom setting. They felt that the emotional difficulty in the home environment had no impact in the educational setting. Since B.G. had never been disciplined by the principal, the Team concluded that he had no behavioral problem. This shallow analysis ignored negative conduct at both home and school. In each environment B.G. was immature, distrustful, unconfident, disruptive and alienated from the group. From October through April 1986, Sobelson, an experienced teacher, termed B.G.'s personal and social behavior as "very, very poor." Notwithstanding B.G.'s emotional, neurological and visual problems, the CST concluded that a free, appropriate public education program for B.G. in the least restrictive environment was a classification of P.I. with a program implemented in the Team's own school district. The ALJ disagreed and ordered that B.G. be classified as E.D.
Though the E.D. classification was not appealed, the decision of the ALJ was correct. The "emotionally disturbed" category
means the exhibiting of seriously disordered behavior over an extended period of time which adversely affects educational performance and may be characterized by i. or ii. below. An evaluation by a psychiatrist experienced in working with children is required.
i. An inability to build or maintain satisfactory interpersonal relationships;
ii. Behaviors inappropriate to the circumstances, such as, a general or pervasive mood of depression or the development of physical symptoms or irrational fears.
N.J.A.C. 6:28-3.5(e)(4). The IEP that accompanied the P.I. classification was palpably insufficient in that it ignored B.G.'s emotional problems. The absence of a psychological component through counseling or other behavioral modification recommendations is astonishingly glaring. Though B.G. tested well before the LDTC, his academic under-achievement with an approximate I.Q. of 90 clearly demonstrated that, despite a capacity to learn, B.G. was not learning. The ALJ found B.G.'s "seriously disordered behavior has adversely affected his educational performance."
As the dead hand of the past is linked to the future, so it was with B.G.'s emotional problems. F.G., disappointed and frustrated with the Board, accepted a YBP placement for B.G. when it became available. YBP's focus was the emotionally disturbed child with special emphasis on the unbonded attachment syndrome. Christopher Waldmann, B.G.'s assigned therapist, considered B.G. as one of the worst cases he had seen. As the program proceeded, both Waldmann and Gregory Miller, YBP's executive director, noticed an improvement in B.G. through the diminution of his anger and limited acceptance of responsibility. However, B.G.'s academic performance remained static, notwithstanding his promotion to the seventh grade. As a mainstreamed student at Jefferson, his grades were comparable to those he received in Cranford and were similarly undistinguished.
The CST members reconvened in February 1987. At their staffing they knew B.G. had been mainstreamed and unclassified at Jefferson. They knew nothing of his academic performance, current emotional status or social and personal behavior. Lacking this information, they developed another IEP that possessed minimal psychother-apeutic content, contrary to the admonitions contained in the reports of Volenski and Oliver-Smith, who each found B.G. to be suffering from severe emotional disturbance (supra, p. 1147). The CST proposed Monday morning counseling by Hegedus, who is a certified school psychologist but not a clinical psychologist. Hegedus's exposure to B.G.'s type of attachment disorder was limited to some random reading of available literature.
*1151 The presentation of a second inappropriate IEP spawned another due process hearing. At that hearing[19] Waldmann reviewed the Youth Behavior Program.[20] He acknowledged the progress that he felt B.G. had made and strongly counseled against B.G.'s removal from the program. In his opinion B.G. required one more year of YBP with a gradual transition to his adoptive home environment.[21] Despite B.G.'s desire to return home, his current disruptive behavior such as fighting, threatening suicide, interacting poorly with peers, showing disrespect for teachers and telling outlandish stories, documented a present psycho-disturbance and the continued need to acquire socialization skills. Though Waldmann acknowledged that the Board could meet B.G.'s academic needs, since there had been no difference between his Cranford and Jefferson performance, he felt that it would be detrimental to return B.G. to Cranford even if a program similar to YBP was constituted and available in New Jersey.[22] Like Volenski, Waldmann was unable to separate B.G.'s academic needs from his emotional needs.
Both Volenski and Oliver-Smith also testified at the second administrative due process hearing, though neither had seen B.G. since early- to mid-1986. Volenski, however, had kept in touch with F.G. and was aware of both B.G.'s behavioral improvement and tenuous academic progress. He reasserted his prior opinion that B.G.'s problems required a therapeutic environment and that the IEP with mainstreaming and counseling was inappropriate. According to Volenski, the IEP proposed by the CST was not in B.G.'s best interest and would severely hamper his progress; it would cause B.G. to regress in both the home and school setting with behavior similar to that which preceded his placement at YBP.[23] Reaffirming B.G.'s need for a continuing therapeutic environment, Volenski negated the prospect of B.G. then returning to the F.G. home, terming it as "premature." When queried as to the Board's ability to meet B.G.'s needs, Volenski expressed the opinion that Cranford could provide everything that the YBP provided, except for the therapeutic environment. In his thinking, the real difference between the proposed IEP and B.G.'s YBP experience was B.G.'s ability to live outside the F.G. home with specially trained therapeutic foster parents capable of providing B.G. with structure, capable of confronting his negative behavior and capable of bonding B.G. to them. Volenski unequivocally repeated his prior testimony that B.G.'s emotional disturbance affected B.G. at home and school alike, inhibiting B.G.'s ability to learn. He was unwilling to depart from his opinion even when confronted with occasions on which B.G. was extremely adaptive to the school setting. An impression of functioning well one day, he concluded, is offset by functioning poorly the next.
Dr. Oliver-Smith, in response to a hypothetical question, rejected the CST's IEP as an improper placement in that it failed to address B.G.'s emotional difficulties. She felt that B.G. required his current therapeutic environment in order to develop trust both in the home and with his peers. She supported Volenski's opinion that mainstreaming was inappropriate, weekly counseling inadequate and a self-contained classroom essential. In order for B.G. to *1152 perform well academically, his emotional issues must first be resolved, according to Oliver-Smith. Because of B.G.'s behavioral progress in Colorado, she would be reticent to change therapists, despite the availability of a qualified therapist in New Jersey. In regard to the feasibility of B.G.'s resuming residence with the F.G.'s, Oliver-Smith felt it unwise since the F.G.'s are not therapists and do not maintain a therapeutic home. Notwithstanding B.G.'s progress at YBP, she held to her prior diagnosis that B.G. was multi-handicapped with severe pathology. In her opinion B.G. has benefited from his stay at YBP and though B.G.'s needs were not being addressed by Jefferson, YBP is the best program for him. Oliver-Smith contemplated that academic improvement for B.G. is at least two years away and will occur only when he develops more self-awareness and trust.
B.G.'s behavioral progress from July 1986 through September 1987 was detailed by F.G. He recounted four particular visits that provided the ALJ with a mixed review as to B.G.'s improvement. Thanksgiving and a Colorado ski trip were particularly positive experiences. F.G. described Thanksgiving as having transpired exceptionally well and the April 1987 ski trip as a good visit. Christmas 1986 and July 4, 1987 were not particularly pleasant. At Christmas B.G. was argumentative and selfish, resorting to the type of behavior that previously had dismantled family accord. During the July visit, B.G. jumped on his father's back at the pool despite several warnings, lied about cleaning his room and refused to wear prescribed clothing for church attendance. F.G. was particularly distressed by an incident that occurred in the early morning hours in which he found B.G. standing near his sister Briget's bed while she was sleeping. F.G. felt B.G.'s conduct to be inappropriate.[24] Though B.G.'s academic performance had not improved, F.G. was very pleased with YBP. He correctly observed that an IEP without therapeutic support was inappropriate, especially in light of B.G.'s lack of academic progress in YBP's supportive therapeutic environment. In F.G.'s opinion, B.G. requires supplemental psychological services outside the home to achieve his maximum educational benefit. It is the school's obligation, F.G. stated, to prevent B.G.'s emotional problems from interfering with his learning abilities.
The CST, through its constituent members and Cashman, all testified before the ALJ. Their support for a district-venued program was on the theory that such a program for B.G. would ensure him a free appropriate public education in the least restrictive environment. The ALJ disagreed.

(C) Evidence Before This Court

At the hearing before this Court, Cashman, Hegedus, David Winikur, F.G. and Volenski testified.
Cashman, though he had never observed nor tested B.G., felt that whatever treatment B.G. needed could be encompassed in a suitable program for B.G. The anger and spill-over behavioral problems of B.G. emanating from the F.G. home were common to the school's experience with other students. Therefore, since other students' conduct disorders were being addressed, according to Cashman, B.G.'s could be similarly addressed. In Cashman's opinion, Colorado was not the answer to B.G.'s problems for several reasons. First, Jefferson's program was not equal to that of Cranford. Second, from a totality of information received, YBP had not been successful with B.G.[25] And third, sending B.G. to Colorado was an act of rejection. In his opinion B.G. needs bonding to his adoptive family. Based upon an independent evaluation by Pace Clinical Services *1153 ("Pace"),[26] Cashman determined that B.G.'s educational needs could be met in a regular secondary school system. He dismissed a residential placement for B.G. since neither Volenski nor Oliver-Smith have demonstrated that Cranford's programs are unsuitable. He further felt that a residential placement for B.G. was not for educational purposes and therefore unauthorized. Lastly, the CST had not recommended a residential placement for B.G.
Hegedus, the school psychologist, reviewed his tests and findings pertaining to B.G. As a member of the CST, he participated in the IEP classification and program. He thought the IEP was appropriate and expressed dismay that it was never given a chance to succeed. His testimony also reviewed other more restrictive programs available in Cranford, including crisis intervention as a spur-of-the-moment reaction to a spontaneous occurrence.[27] Though the IEP addressed B.G.'s emotional needs, Hegedus was still of the opinion that B.G.'s perceptual problems were more manifest and that they, not his family problems, were impeding his school progress.
White, the LDTC who participated in the formulation of each of B.G.'s IEPs after evaluating data received from Colorado and the report of PACE, testified that nothing contained in these reports indicated to her that the CST program would not have worked. She reiterated that B.G. was an academic underachiever who in her opinion was making some academic progress despite no discernible improvement in grades received. White defended the IEP as being appropriate for an E.D. handicapped child since the behaviors attributed to B.G. outside the school were not the behaviors observed in the classroom. Acknowledging that parents must be part of a child's development, White pointed to available local agencies and facilities to provide B.G.'s parents the training and techniques they would require in handling B.G. at home.
David W. Winikur, the Executive Director of PACE, an individual with an extensive background in the delivery of special educational services to handicapped children and a former employee of the State Department of Education, testified at the hearing before this Court. He concluded that the CST's IEP was not unreasonable, basing his opinion on an independent evaluation conducted by PACE that included two observations of B.G. One of those observations was by Barbara K. Lacy, a learning consultant. From her interview with B.G. and the tests conducted, Lacy concluded that except for math, where some progress had been made, B.G.'s fund of general information fell within the seventh grade range.[28] In her presence B.G. was cooperative, motivated and attentive. A psychological evaluation was performed by Laura E. Beider, a certified school psychologist. Beider reviewed B.G.'s records and performed a number of standardized psychological tests normally employed in evaluations such as occurred with B.G.[29] She too found B.G. to be cooperative, though she observed a high degree of motor restlessness. Her tests demonstrated that B.G. functions in the average range of intellect with a full-scale I.Q. of 92. After an assessment of his strengths and weaknesses she concluded that B.G.'s current situation is conflict-laden. Her comments in support of that conclusion are worthy of repetition:
A variety of indicators of emotional stress and concentration difficulties were noted. [B.G.] appeared to be insightful regarding his own difficulties. He tends to view the world as unpredictable and frightening. The normal teenage conflicts and self-doubts are heightened in this youngster.
*1154 Winikur's analysis of the reports of Lacy and Beider was positive since they demonstrated academic as well as psychological growth. His recommendation that B.G.'s educational needs could be met in a regular secondary school program included supplementary assistance through an ongoing program of family and individual therapy for B.G. Winikur was a very candid witness who felt that although the CST's IEP could be improved, a host of options lay between the recommended IEP and the ALJ's residential placement decision. He commented that it would not be unusual for additional services to be added to an IEP.
Acutely missing from Winikur's source of information was an updated social investigation[30] and a recent psychiatric report. Additionally, he never saw B.G., nor did he speak with Volenski or a representative of YBP. Although the ALJ's opinion was supplied to him, the underlying source material was never submitted for his review.
F.G. provided background testimony as well as additional information focused on B.G.'s home visits, acts of sexual aggression, reinvolvement with the setting of fires and other acts of juvenile delinquency. In his opinion B.G. had regressed and was demonstrating pre-YBP behavior. F.G. was particularly distressed with the acts of sexual aggression because of his two adopted daughters. Two of the acts involved B.G.'s therapeutic foster mother. In the initial incident, B.G. touched her breast while she was sleeping. The second incident occurred at night while both therapeutic foster parents were sleeping. B.G. entered their bedroom and placed his hands between his foster mother's legs either touching or attempting to touch her vagina.[31] The other act of sexual aggression was directed towards B.G.'s youngest sister when he unsuccessfully tried to insert his penis in her vagina.
As a result of the totality of incidents, YBP contacted F.G. and advised him that their program was no longer an appropriate placement for B.G. F.G. contacted Volenski, who recommended Deveraux House as an appropriate residential placement. F.G. also sought information as to other residential placements. Updated psychiatric reports were procured from Volenski and Oliver-Smith.
F.G. completed his testimony with the dispirited conclusion that B.G. cannot currently return to his home. F.G.'s wife cannot handle it nor will F.G. expose his daughters to B.G.'s sexual aggression. B.G., in his opinion, must have residential treatment, though F.G. initially resisted this by enrolling B.G. in YBP.
Volenski was the last witness to testify. He had updated his psychological report and had reviewed Oliver-Smith's recent psychiatric report. B.G. had related to Volenski his sexual fantasies, which Volenski explained were a means by which B.G. released his anxiety arising from sexual impulses. However, in B.G.'s case, sexual fantasies were fused with other aggression and posed a potential danger in a public school setting. In Volenski's opinion B.G. had no control over his aggressive feelings or sexual fantasies.
Volenski also characterized B.G. as a borderline psychotic. B.G. told Volenski of hearing voices that suggested that B.G. hurt himself. Volenski was also concerned with B.G.'s preoccupation with a type of music known as "heavy metal," which B.G. would listen to for hours at a time. In Volenski's opinion B.G.'s behavior merited watching.
In terms of B.G.'s educational needs, Volenski was satisfied that B.G.'s emotional disturbance interferes with his cognitive function. Poor social skills, lack of insight and limited growth with his attachment disorder interfere with his ability to learn. Volenski forcefully rejected a public school *1155 setting and recommended Deveraux,[32] a residential program geared towards each child's capacity to learn. Such an education placement would in Volenski's opinion be the least restrictive. Factored into this judgment was the reality that the F.G.'s cannot deal with B.G. in his current state.
Accompanying the testimonial evidence and as part of the record are three other significant evidentiary items. First, the YBP discharge summary dated August 26, 1988 and prepared by Waldmann recounts B.G.'s acts of sexual aggression. It concludes with Waldmann's diagnostic impressions and recommendation that B.G. be placed in a residential facility for boys. In pertinent part the Waldmann summary said:
... [B.G.] is a very angry young man, prone to aggression. He has also had a difficult time attaching to a family. We therefore recommend that [B.G.] be placed in a residential facility for boys. Considering his problems with bonding and attachment, a facility that specializes in this area, such as Forest Heights Lodge in Evergreen, Colorado, would be most appropriate.[33]
A report contemporaneous to Waldmann's was prepared by Connie Isaac, the Executive Director of an organization called Redirecting Sexual Aggression, Inc. Her diagnostic impression was contained in a thorough and comprehensive report, which included interviews with B.G. and his therapeutic foster parents. She found that B.G. exhibits a power/control style of response; when coupled with his other behavioral deficits, this response lends itself to the development of grandiose and narcissistic expectations that will enable him to feel okay about violating others rights in the future. Isaac labeled B.G.'s inappropriate sexual activity as a form of acting out in which he engages when his internal anxiety reaches an intolerable level. Isaac was highly suspect of B.G.'s protestations that he has changed and will not engage in further inappropriate sexual behavior. More than likely, she theorizes, his sexual behavior will continue but in a more secretive manner. Because of the strong possibility that B.G. will sexually reoffend, she emphatically recommended that he be placed in a residential care facility, thereby excluding placement in a community-based program. Any placement for B.G., she commented, should involve a program designed to address his sexually aggressive behavior. Goals for that program accompanied her report.
The third and last in the trinity of documents was an updated psychiatric report from Oliver-Smith, dated September 16, 1988, based on interviews with both F.G. and B.G. F.G. was concerned about suicidal ideation. B.G. discussed his anger, sexual abuse by his biological mother, and current distrust of others. He is apprehensive about attending the Deveraux school. Oliver-Smith's findings, diagnostic impression and recommendation are worthy of extraction from her report and merit repetition. In their pertinent part, they are as follows:
[B.G.] impressed the examiner as a confused, angry, anxious, insecure, depressed, guilt ridden young man who feels rejected and abandoned by significant others in his life. He appears to be socially and emotionally isolated. He has experienced a series of traumas in his early childhood, and repeated seeming rejections and separations have contributed to feelings of rage, acting out behaviors, and a profoundly negative self image. [B.G.'s] inner rage appears to be directed against females. There appears to be a risk of acting out against others. His preoccupation with his conflicts and inner turmoil have inhibited his ability to perform optimally or adequately function in his environments (including school).
* * * * * *
Diagnostic Impression:

*1156 Severe Adjustment Disorder with mixed disturbance of conduct and emotions.
Dysthymia
Attention deficit disorder with probable neurologic impairment. For purposes of education, classification of Emotionally disturbed is recommended.
Recommendations:
There are a confluence of factors (such as unresolved issues relating to rage, deep feelings of rejection, clear clinical symptoms of depression, and inappropriate sexual acting out behavior), which indicate emotional regression. It is highly unlikely that [B.G.] will be able to adequately function at home with his adoptive parents, and unlikely that he will be able to achieve his potential academically if he is home.
It is therefore recommended that [B.G.] be placed in residential placement, and that he receive individual and family (if possible) therapy on a regular and sustained basis.

(D) Findings of Fact and Conclusions of Law

With this review of the record of two administrative proceedings and the record created before this Court, it is now appropriate to return to the questions raised in Rowley (supra, p. 1149). First, I find that the Board has complied with the procedures set forth in the EAHCA. Any minor deviations in the format of B.G.'s IEP elicited from testimony of school officials before the ALJ were not of the magnitude to subvert the prescribed administrative procedures promulgated through the New Jersey Administrative Code. The CST was comprised of certified professional staff members who engaged in the pre-conference staffings and formulated B.G.'s IEP substantially in conformity with the Code.
Though the CST mechanically applied the Code, the IEP it developed was clearly not calculated to enable B.G. to receive educational benefits. Thus, the second Rowley inquiry must be answered in the negative.
Notwithstanding all the outside consultant reports pertaining to B.G.'s emotional status and the portrayal by the F.G.'s of his behavioral disturbance in the home setting, the Child Study Team adopted a totally unsuitable IEP for B.G. Convinced that B.G.'s home behavior was aberrant and dissimilar to that observed in the school environment, the CST's educational compass heading erringly pointed it away from the area of his emotional problems. B.G. was and continues to be a severely disturbed youth with a complex emotional disorder requiring therapy beyond the training and certification of the school psychologist. To suggest, as the CST did, that Monday morning counseling by Hegedus would satisfy the emotional component of an E.D. program bordered on the irrational and hazarded the irresponsible. It is understandable why the programming conference with the F.G.'s was so attenuated and unproductive.
Undoubtedly, B.G. is a multi-handicapped child with severe emotional disturbance, neurological impairment and a lack of socialization skills. His educational rite of passage entitles him to a program and services that will permit him to best achieve educational success. Though B.G. is not mentally retarded and possesses a normal I.Q., his handicap is as real to him as the disabilities experienced by the disabled children in Kruelle (a profoundly retarded child incapable of administering to his own needs) and Diamond (a neurologically damaged child whose ability to walk and communicate was impaired). In each of these cases, as well as in Geis, the reviewing courts concluded that a residential placement was necessary and rejected the school officials' position that the social and emotional problems implicated were disassociated from the school's responsibility.
Like the school boards in the above-cited cases, the CST and the Board in the case at bar are engaged in a denial of B.G.'s emotional problems. They incorrectly believe that B.G.'s emotional and neurological problems are segregable from the learning process, despite Volenski's and Oliver-Smith's contrary assertions. As gleaned from the source materials presented to this *1157 Court and to the ALJ, B.G. is a complex web of psycho-disturbances. The insidious nature of his handicap is the uneven manner in which it manifests itself. As Volenski indicated, B.G. has good days and bad days.
This Court finds that B.G.'s emotional problems and lack of socialization skills, as evidenced through expert testimony and evaluative reports, are unseverable from the learning process and that a residential placement is necessary for learning. Despite two years at YBP, B.G. shows strong signs of regression, lack of educational achievement, and new forms of aggression. Though YBP was not a traditional residential placement, its out-of-home living arrangement supplied some of the features of a residential placement. However, its lack of an educational component and release of B.G. to a mainstreamed education at Jefferson denied B.G. the program consistency that he required. The mere fact that B.G. obtained passing grades (barely) and was promoted to the next grade level at Jefferson, though perhaps sufficient to satisfy the minimum federal standards under Rowley, is insufficient and inconsistent with New Jersey's requirements that B.G. be afforded a program that assures him the fullest opportunity to develop his intellectual capacities. See Geis, 774 F.2d at 582.
The Board argues that the CST program is an appropriate program in the least restrictive environment. The Board views a residential placement as far more restrictive than the CST program because it will of necessity place B.G. out of the district. A similar argument was viewed as specious in Diamond, 808 F.2d at 992. "Least restrictive environment" means a setting that is as similar as possible to the regular setting in which the pupil would be educated if not considered handicapped. Such a setting is selected in light of a pupil's special educational needs. N.J.A.C. 6:28-1.3. The least restrictive environment for B.G., considering the nature of his disability, is a residential placement.
A residential placement has been recommended for B.G. by no less than five certified psychotherapists. Volenski, Oliver-Smith, Gold, Waldmann and Isaac all clearly say B.G. needs a residential placement. Only Hegedus disputes the placement and opines that B.G. is not as seriously impaired as all the outside consultants believe he is. Even the Board's own psychiatric consultant, Levine, did not quarrel with the diagnostic reports of Volenski and Oliver-Smith, and concluded that he had nothing to add to them.
B.G.'s window of opportunity to achieve a free, appropriate public education in the least restrictive environment is slowly disappearing. He is now 14 years, nine months old. Since June 1986 the F.G.'s have been locked in legal combat with the Board while B.G. continues to academically and socially regress. Deveraux House officials have indicated that B.G. is acceptable to them as a student, though they have reservations about him due to his sexual aggressiveness and proclivity for setting fires. Deveraux is on the Department of Education's approved list of residential placements. It has been recommended by Volenski. Deveraux possesses the capacity to provide B.G. with the constant, consistent, professionally administered behavior modification program that he requires as a prerequisite to learning. As Oliver-Smith noted in her September 1988 report, it is "unlikely that [B.G.] will be able to achieve his potential academically if he is home."
I find by a preponderance of the credible evidence that the EAHCA, as administered in New Jersey, requires that B.G. be placed in a year-round residential program and that the Board pay for B.G.'s associated costs; the opinion of the ALJ is supported by the evidence and is affirmed. I further find that B.G.'s aggressive sexual behavior, termination from YBP, and overall conduct pattern stemming from his emotional disturbance preclude my consideration, at this time, of his return to the F.G. home. The Board's request for an opportunity to implement its IEP and Winikur's observation that there are programs in between the IEP and residential placement is an at risk suggestion that this Court is unwilling to accept.
*1158 The Court has learned that B.G. is no longer living in Colorado and has returned to the F.G. residence. His education is temporarily suspended. A sense of urgency compels this Court to act swiftly. Accordingly, the Board is directed to forthwith reconvene the CST and develop an IEP providing for a residential placement, preferably at Deveraux House and consistent with the opinion of the ALJ. This Court shall retain jurisdiction and hereby anticipates that a residential placement shall be completed within 30 days of the order implementing this opinion.
An appropriate order in conformity with this opinion is attached hereto.

ORDER
For the reasons set forth in an opinion of this Court issued herewith,
It is on this 18th day of November, 1988,
ORDERED that the opinion of Administrative Law Judge Edith Klinger dated September 30, 1987 is affirmed insofar as it relates to residential placement for B.G.; and it is
FURTHER ORDERED that B.G. be placed in a year-round residential program approved by the State of New Jersey for emotionally disturbed students with some provision made for his perceptual impairments and for necessary psychotherapy, preferably at Deveraux House and consistent with the opinion of the ALJ; and it is
FURTHER ORDERED that the Cranford Board of Education pay for all expenses for B.G. to attend his placement, including psychotherapy, tuition, books, supplies and room and board, and it is
FURTHER ORDERED that the Board shall forthwith reconvene B.G.'s Child Study Team to develop an Individualized Education Program consistent with the provisions of this Order and the Opinion issued herewith; and it is
FURTHER ORDERED that a residential placement for B.G. shall be in place within 30 days hereof; and it is
FURTHER ORDERED that this Court shall retain jurisdiction to ensure a speedy and appropriate residential placement for B.G., and it is
FURTHER ORDERED that all other issues are reserved and shall be the subject of a supplementary opinion and order.
NOTES
[1] At the home interview, B.G. was described as an immature boy who engages in disruptive behavior, has difficulty with other children, lacks self-confidence and self-esteem, engages in angry rages, is argumentative, exhibits aggressive behavior, alienates people through disruptive acts, lights fires at the home, is a pathological liar, steals, lacks a conscience, does not experience guilt or remorse, and exhibits socio-pathic behavior.
[2] The LDTC was particularly concerned with B.G.'s attention span, distractibility, attention to task productivity and achievement in basic skills (reading, math, language). Matters of visual memory, auditory memory, visual/motor integration and coordination are also matters of concern.
[3] In both testimony before the ALJ on September 22, 1986 and in a prior interview with DePinto, Sobelson explained B.G.'s behavior as follows: immature, makes faces constantly, antagonizes and bothers classmates, not accepted, poor organizational skills, and never ready for a lesson. She also depicted him as hesitant to develop a close relationship, possessing a short attention span, constantly in motion by toe tapping, pencil tapping and shifting in his seat.
[4] Dr. Vicci, after a February 1986 examination, found that B.G. experienced auditory processing problems, attention and concentration difficulties, and abnormally slow visual motor speed.
[5] Dr. Arnold Gold is a preeminent pediatric neurologist who examined and tested B.G. on March 21, 1986. He concluded in his report that "I do not believe that this child could be managed at home with weekly psychotherapy but will require a residential therapeutic program."
[6] The basic IEP includes a statement of objectives describing specific measurable steps between current educational status and annual goals.
[7] A self-contained handicap class normally consists of 12 students unlike mainstream classes containing 20 students.
[8] Sometime after the F.G.'s had mailed the Volenski, Oliver-Smith and Gold reports to the school, DePinto called F.G.'s wife and said: "It looks like B.G. is going to be classified emotionally disturbed."
[9] Sobelson, whose last report characterized B.G.'s personal-social behavior as "very, very poor," told the CST staffing that B.G. had made significant strides in May and that B.G. was vastly improved. B.G. trusted her as they had finally established a bond. She also cited an example of improved peer relationships. Sobelson concurred with the CST that P.I. was the proper classification and that the IEP as formulated was correct.
[10] At that time YBP was a program limited to approximately 14 youths. Its focus was emotionally disturbed children with special emphasis on the unbonded attachment syndrome. Among YBP's goals was the gradual reintegration of its enrollees into the home environment within 12 to 18 months.
[11] In her opinion, the ALJ observed that YBP appeared to be an appropriate placement and that even a residential placement may be appropriate. She noted that B.G.'s placement at YBP was his parent's voluntary act and that they may be entitled to reimbursement.
[12] The ALJ commented that an inability to resolve the questions of an appropriate IEP and placement or agreement on reimbursement would necessarily have to be the subject of a new appeal.
[13] YBP is not an educational program and does not contain an educational component. YBP confronts negative behavior in emotionally disturbed children by application of appropriate reasonable consequences to negative behavior, thereby making the child totally accountable. Under its program the child lives with a therapeutic foster family and receives individual therapy; a therapist is on call 24 hours per day.
[14] "Mainstream" is a term used to indicate the educating of handicapped children with nonhandicapped children. 20 U.S.C. § 1412(5)(B).
[15] SCRIPT was a computerized program developed by the New Jersey State Department of Education that would identify suitable and appropriate placement programs for handicapped children. A handicapped child's profile would be submitted and a printout of available placements would be returned. Apparently, this program is no longer available.
[16] A "time-out" occurs when a child attending a mainstream class becomes disruptive and is in need of another school-located environment to regain control.
[17] Specifically, the CST members were aware of the CAP and KORE programs, which deal with student nonconforming classroom behavior such as test anxiety, peer problems and arguments with teachers.
[18] For example, the EAHCA focuses on the participant state's establishment of an IEP for each handicapped child. 20 U.S.C. 1414(a)(5). N.J. A.C. 6:28-3.6 complies with this congressional mandate.
[19] The hearing was held by the ALJ on August 10, 11 and 12, 1987.
[20] The YBP provided for B.G.'s placement with certified therapeutic foster parents, weekly psychotherapy with an assigned therapist, an on-call therapist 24 hours daily, a backup therapeutic foster family, if necessary, and attendance at local schools as a classified student with an EBD classification. Parental training was also an integral component of the program. F.G. testified that he could not financially afford the parental training program offered by YBP.
[21] B.G. had returned home during Thanksgiving and Christmas, 1986 and July 1987. These visits received mixed reviews from F.G.
[22] The CST program is set forth supra at pp. 1146-1147. The significant difference between B.G.'s Colorado experience and the proposed IEP was his residence with the therapeutic foster family and their confrontation of his negative behavior.
[23] The specific behavioral regression was enumerated in Volenski's testimony before the ALJ.
[24] At no time had B.G. struck any of F.G.'s family, destroyed property, used vulgar language or exhibited obstructive conduct, according to F.G.
[25] The totality of information to which Cashman referred included acts of sexual aggression involving B.G.'s therapeutic foster mother, involvement with setting a fire, and Waldman's summary discharging B.G. from YBP.
[26] Pace Clinical Services examined B.G. and on July 18, 1988 reported its psychological and learning evaluations of B.G.
[27] The other programs are CAP and KORE. They are E.D. behavioral modification programs that feature departmentalized crisis intervention.
[28] At the time that these tests were performed, B.G. was a 14-year, four-month-old adolescent.
[29] The methods used were Bender-Gestalt Test of Visual Motor Integration, Bender Recall, Informal Projectives, Sentence Completion, Writing Sample, Kinetic Family Drawing, and Wechsler Intelligence Scale of Children-Revised.
[30] Winikur was under the impression that the F.G.'s would not permit an updated social investigation. Some confusion exists as to why the social investigation did not take place.
[31] As a result of this second sexual aggression involving his therapeutic foster mother, B.G. was removed from their home and placed with another family. The first incident occurred in April 1988 succeeded by the second incident in July.
[32] Deveraux is a residential placement approved by the New Jersey Department of Education. F.G. and B.G. visited Deveraux and B.G. was found to be acceptable on a probationary basis. His sexual aggression, anger, and fire involvement were a source of concern to the Deveraux authorities.
[33] An application submitted to Forest Heights Lodge on behalf of B.G. was rejected.