**D.R., by his parents and guardians, M.R. and B.R., Plaintiffs,**

v.

**EAST BRUNSWICK BOARD OF EDUCATION, Defendant.**

Civ. A. No. 93–560.

United States District Court, D. New Jersey.

Nov. 23, 1993.

Herbert D. Hinkle, Lawrenceville, NJ, for plaintiffs.

Martin R. Pachman, Lisa A. Sanders, Freehold, NJ, for defendant.

## OPINION

WOLIN, District Judge.

This matter was opened to the Court by plaintiff, D.R., pursuant to Federal Rule of Civil Procedure 56 for an order granting

plaintiff summary judgment and was responded to by way of a cross-motion for summary judgment by defendant, East Brunswick Board of Education (the "Board"). Having reviewed all the papers and briefs filed, the Court denies plaintiff's motion and defendant's cross-motion for summary judgment, and remands the matter to the Office of Administrative Law

## BACKGROUND

The parties contend that there are no material facts in dispute. D.R. is an eighteen-year old multiply handicapped student who has been classified by defendant as in need of special education. Administrative Law Judge ("ALJ") 12/14/92 Opinion, p. 3. D.R. attended the Middlesex County Cerebral Palsey Center–Lakeview School for the 1989–90 and 1990–91 school years. Believing that he was not making progress, during the 1991–92 school year D.R.'s parents requested a change in placement to an out of state residential school, the Benedictine School located in Ridgely, Maryland. When the Board disputed the need for residential placement, D.R.'s parents unilaterally placed him at Benedictine in early January, 1992 and simultaneously instituted an action pursuant to the Individuals with Disabilities Education Act ("IDEA" or "the Act"). 20 U.S.C.A. § 1401 *et seq.* At a mediation conference held on February 3, 1992, the parties entered into a settlement agreement ("Agreement"). The Agreement provides in relevant part:

At the mediation conference held in the above-cited matter the parties agreed to the following:

The following adjournment will be considered an agreement when the East Brunswick Board of Education approves it:

It is agreed by and between D.R. by his parents M.R. and B.R., and the East Brunswick Board of Education that:

1) The East Brunswick Board of Education will compensate placement costs at the Benedictine School for D.R. at an annual rate of $27,500 prorated for the balance of the 1991–2 school year including summer of 1992 and beginning January 1, 1992;

2) For the 1992–93 school year the Board will contribute 90% of any increase over the 1991–92 rate.

3) The Board will be absolved of any other or further costs based upon this placement, related services, or transportation in connection therewith.

By entering into this agreement, the Board was responsible for paying $27,500 prorated toward the $30,000 annual cost for 1991–92.[1] Several months after the Agreement was signed, the Board received an estimated 1992–93 Benedictine School program cost for D.R. The costs totaled $62,487 and included a provision for the services of a one-to-one aide for D.R. during his waking hours. The Board refused to pay any portion of the cost associated with the aide and D.R., by his parents, requested a hearing pursuant to N.J.A.C. 6:28–2.

In that action, D.R. asserted that (i) since being placed at Benedictine, the staff there determined that D.R. required the services of a one-to-one aide in order to benefit from the program, and that unless the aide is provided D.R. could not continue in the program; and (ii) D.R. is in need of both a residential program and a one-to-one aide in order to prevent serious regression. As the Board had refused to pay for the aide, D.R. sought an order finding *inter alia* that he was in need of residential placement and a one-to-one aide, that the current placement along with the provisions of the aide were appropriate and that the Board was required to pay for the cost of an aide.

At the start of the hearing before an Administrative Law Judge of the State of New Jersey, counsel for defendant made an oral motion for dismissal, arguing that under the terms of the February 3 Agreement the Board was not bound to pay for the aide. The Honorable M. Kathleen Duncan, Administrative Law Judge, decided to bifurcate the proceeding. Tr. 4:1–10. In the first stage of the hearing, conducted October 26, 1992, the

---

1. The annual cost of the program included occupational therapy, physical therapy and speech and language therapy.

administrative law judge stated that she would hear three issues: (i) is the Agreement binding between the parties; (ii) if yes, then is the Board required to pay 90% of the cost of a one-to-one aide; and (iii) has the Board satisfied its burden pursuant to IDEA. *Id.* The second stage of the proceeding, which apparently never occurred, was to deal with the substantive testimony on *inter alia* the one-to-one aide. Tr. 5:4-18. During the first stage, the ALJ conducted a limited hearing on October 26, 1992, wherein D.R.'s father and Susan Preston, Supervisor of Special Education for the Board, were permitted to testify regarding their understanding of the Agreement.

The outcome of the first stage of the proceeding is outlined in a letter from the ALJ dated November 5, 1992. The November 5th letter advising the parties of the outcome of the hearing, only lists two conclusions—that the Agreement was a legally enforceable contract between the parties and that pursuant to the Agreement the Board's obligations for the 1992–93 school year were limited to 90% of the increase over the 1991–92 rate for education and basic related services, related residential services, room and board, including physical therapy, occupational therapy, and speech. This letter advised

> A written opinion discussing these conclusions will be issued either forthwith or following additional evidence on the merits of the I.E.P.,[2] placement, and residential costs, depending upon how you decide to proceed. If the parents determine not to pay the additional costs for 1992–93 or they cannot pay the additional costs which apparently Benedictine requires for continued enrollment for 1992–93, I will need something in writing from them so stating. They will then be in breach of the agreement and the agreement becomes a nullity, and the Board is relieved of further performance (and may be entitled to reimbursement). In that event, the case can continue ... with the Board moving forward on

all issues. If you wish to appeal my rulings on the settlement agreement before proceeding further, I will issue a decision now, dismissing the petition and articulating my reasons.

Plaintiff decided to file a motion for reconsideration concerning the Agreement and a formal opinion was issued on December 14, 1992. The opinion states that the ALJ decided that a "final decision" granting the Board's motion "should be issued before any further proceedings with respect to the merits of the issues." 12/16/92 ALJ opinion, p. 2.

By way of a letter dated November 16, 1992 (sic), D.R.'s attorney filed a second action alleging that D.R. "is in need of ... the 1 to 1 aide," and contending that the first action "did not examine [D.R.'s] educational needs" but "dealt only with the [settlement] agreement." *See* Office of Administrative Law Decision, EDS 10062–92, Dkt. No. 93–5095 ("1/19/93 ALJ Opinion"). The Board moved to dismiss D.R.'s second claim as barred by operation of the doctrine of res judicata. In an opinion dated January 19, 1993, the Board's motion was granted. This opinion concluded that D.R.'s claim was the same as that decided in December, 1992 and that because it was already correctly decided that the Agreement was valid and enforceable, and that that claim was governed by and barred by the Agreement, the current petition was barred by res judicata. *Id.*

## DISCUSSION

The motion for summary judgment is intertwined with the decision of the ALJ, pursuant to 20 U.S.C. § 1415(e)(2). In order for the Court to have subject matter jurisdiction in an IDEA matter, a final decision must be rendered in an administrative process. 20 U.S.C. §§ 1415(e)(1), (2). The ALJ decision of December 14, 1992, upholding the Agreement, clearly states that it is final pursuant to 20 U.S.C. § 1415(e)(1) and appealable to this Court.

---

**2.** I.E.P. is the acronym for individualized education program. The I.E.P. is a written statement outlining the education placement and goals for the child. 20 U.S.C. § 1401(20). It is developed by a case study team, the child's parents, a teacher with knowledge of the student's

performance, the student (if appropriate), and a representative of the private facility, if the student has been privately placed. *See Fuhrmann v. E. Hanover Bd. of Ed.*, 993 F.2d 1031, 1035 (3d Cir.1993).

This Court is called upon to make an independent determination of the issues before it, giving due weight to the administrative proceedings. *Geis v. Board of Education*, 774 F.2d 575, 583 (3d Cir.1985). Such a review, however, is not an invitation for this Court to substitute its own notions of sound education policy for those of state and local school officials. *Board of Education v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). As set forth in 20 U.S.C. § 1415(e)(2), the starting point of review is this Court's receipt of the record of the administrative proceedings, followed by the hearing of additional evidence at the request of a party. Thereafter, applying a preponderance of the evidence standard, this Court shall grant such relief as it determines is appropriate. *Wexler v. Westfied Bd. of Ed.*, 784 F.2d 176, 180 (3d Cir.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 49 (1986).

█ With respect to the motions *sub judice*, summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir.1989).

█ "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.*

**1. To Be Binding or Not to Be Binding?**

At issue is the Agreement of February 3, 1992 with respect to the placement of D.R., a special education student. D.R. submits that the decision of the administrative agency which held that pursuant to the Agreement the Board is responsible for only 90% of the increase in costs over the 1991–92 school year was erroneous. D.R. asserts that the agreement either (1) requires the Board to pay $27,500 plus 90% of the increase in costs for the 1991–92 school year, including the cost of an aide, or, alternatively, (2) is not binding with respect to the 1992–93 school year given IDEA. On the other hand, the Board argues that the Agreement is legally binding settlement agreement which D.R.'s parents subsequently wish to abrogate because they no longer want to be bound to its economic terms.

**A. Settlement and Mediation**

█ It is well settled that settlement agreements to a lawsuit form a contract between parties. *Nolan v. Lee Ho*, 120 N.J. 465, 472, 577 A.2d 143 (1990). Plaintiff asserts that because the Agreement was reached during mediation it is not a binding resolution of a lawsuit. The Court concurs with the Administrative Law Judge that such an assertion is not backed by either case law or logic. *See* Brief and Appendix of plaintiff ("plaintiff's brief"), Appendix pp. 73, 80.

The very purpose of the mediation process is to achieve settlement which would avoid the necessity of litigation. That a settlement achieved at mediation is indeed regarded as a disposition of the issues contained in the agreement is evidenced by the fact that many courts, including the Supreme Court, have found that settlement in IDEA cases is sufficiently final to constitute a legal resolution entitling attorney's fees. *See, e.g., Farrar v. Hobby*, —— U.S. ——, —— – ——, 113 S.Ct. 566, 572–73, 121 L.Ed.2d 494 (1992); *Eggers v. Bullitt County School District*, 854 F.2d 892 (6th Cir.1988); *Shelly C. v. Venus Independent School District*, 878 F.2d 862, 864 (5th Cir.1989), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990); *Barlow–Gresham Union High School Dis-*

*trict No. 2 v. Mitchell,* 940 .F.2d 1280 (9th Cir.1991).

■ The fact that this Agreement was reached during mediation does not in and of itself diminish the effect of the Agreement, or make it any less of a binding contract. To so hold would create a hierarchy of settlement agreements where some are deemed binding while others are not determinable merely by whether they were reached during mediation or during litigation. Such a rule would create confusion and indefiniteness as to the effect of a settlement agreement. Accordingly, it may have a chilling effect on the use of such agreements as parties would never know whether the matter was finally resolved.

For all the above reasons, the Court rejects plaintiff's argument as meritless and finds that the Agreement is a binding final resolution of his action.

### B. Construction of the Agreement

Plaintiff next asserts that the Agreement clearly requires the Board to pay $27,500 plus 90% of the increase in costs for the 1991–92 school year, including the cost of an aide. The Board argues that this interpretation of the Agreement is clearly erroneous and that the ALJ correctly decided that it does not obligate the Board to pay any amount towards the cost of an aide. The issue the Court now confronts is who should pay for the aide under the provisions of the Agreement.

■ When a contract is plain and definite the construction of the contract is a matter of law. *Air Master Sales Co. v. Northbridge Park Co-op, Inc.,* 748 F.Supp. 1110, 1114 (D.N.J.1990). However, construction is not permitted or required when the language of the contract is plain, unambiguous and susceptible to only one interpretation. *See Id.* at 1115, *citing Nevets C.M., Inc. v. Nissho Iwai American Corp.,* 726 F.Supp. 525, 533 (D.N.J.1989), *aff'd,* 899 F.2d 1218 (3d Cir.1990). When the contract is plain, unambiguous and susceptible to only one interpretation, the words contained therein will be given their "plain and ordinary meaning". *Nevets,* 726 F.Supp. at 533,

*quoting Independent Oil Workers at Paulsboro, N.J. v. Mobil Oil Corp.,* 441 F.2d 651, 653 (3d Cir.1971); *see also Goldberg v. Commercial Union Ins. Co. of N.Y.,* 78 N.J.Super. 183, 188, 188 A.2d 188 (App.Div.1963). Consequently, "[i]t is not necessarily the parties' true intent, but the intent as expressed or apparent in the writing that controls." *J.I. Hass Co., Inc. v. Gilbane Building Co.,* 881 F.2d 89, 92 (3d Cir.1989); *see also Dome Petro. Ltd. v. Employers Mutual Liability Ins. Co.,* 767 F.2d 43, 47 (3d Cir.1985).

■ The Agreement is clear and unambiguous. It must therefore be construed to mean what it says, giving the plain and ordinary language its normal and usual meaning. Keeping in mind that D.R.'s parents and the East Brunswick Board of Education signed the Agreement, it must express their intention.

Clearly and unambiguously Paragraph 2 of the Agreement stated:

For the 1992–93 school year the Board will contribute 90% of any increase over the 1991–92 rate.

Plaintiff asserts that the reference to "any increase over the 1991–92 rate" means that the Board would pay any increase in cost from 1991–92 school year to the 1992–93 school year. That is, if the program rate for D.R. jumped from $30,000 to $50,000, then the Board would pay 90% of $50,000, with the parents paying the remaining 10%.

Plaintiff's reading of Paragraph 2, however, selectively incorporates some parts of the Agreement while ignoring others. Specifically, plaintiff wants the Court to incorporate Paragraph 1 which clearly binds the Board to contribute "an annual rate" of $27,500 towards the placement costs at Benedictine, but exclude Paragraph 3 which absolves the Board for "any other or further costs" for "related services, or transportation in connection" with Benedictine. The Court will not engage in such selective reading of the Agreement. We will examine the Agreement as a whole.

Taken collectively, Paragraphs 1 and 3 draw a ring around the services the Board was obliged to pay for during the 1991–92 school year. The contents of this ring were

enumerated in the program cost sheet for the school year 1991–92 which the Board received after the Agreement was entered. *See* Office of Administrative Law Decision, EDS 6529–92, December 14, 1992 ("12/14/92 OAL Opinion"), p. 4. As the program cost sheet showed these services were education and basic related services, related residential services, room and board. They included physical therapy, occupational therapy, and speech. Board's Brief, p. 6. In light of the limiting language contained in Paragraph 3, this array of services, and they alone, comprised the 1991–92 rate.

The testimony of D.R.'s father, M.R., at the administrative law hearing bears out this analysis. M.R. testified that the Board's responsibility in 1991–92 was fixed at $27,500. Tr. 44–45. This amount did not include certain other costs related to D.R.'s placement, such as transportation costs which M.R. was wholly responsible for. Tr. 45:3–8; Tr. 46:11–16. Accordingly, M.R.'s testimony establishes that the Agreement delineated an array of services which the Board was assuming responsibility for in 1991–92 and another array in which they were not.

The Agreement clearly links the Board's contribution for 1992–93 to the 1991–92 rate. Paragraph 2 refers to the 1991–92 rate. It requires the Board to pay 90% of the increase from the 1991–92 rate for the school year 1992–93. Giving the plain and ordinary language of Paragraph 2 its normal and usual meaning, the Board was obliged to pay 90% for any increase in cost associated with these services, nothing more and nothing less. An aide was not one of the services enumerated in the program cost sheet for 1991–92. The program cost sheet illustrates that it is a new service for 1992–93, outside of the array covered in 1991–92, as it is a separate line item. As the cost for an aide is outside of the array of services covered in 1991–92, plaintiff's reading of the Agreement is an attempt not only to add additional services to the program but also to attach the additional cost to the Board in direct contradiction to the Agreement.

However, plaintiff contends that Paragraph 3's limitations on the Board's responsibilities concerns only the first school year, 1991–92, but not the second, 1992–93. The Court has examined Paragraph 3 and finds that it has no such language. In comparing the language of Paragraphs 1 and 2 to Paragraph 3, the Court finds that where the parties desired to reflect different obligations for the different school years, they so stated. Since Paragraph 3 does not contain any reference to the school years, it is clear that it was meant to apply to both years. The Court finds that plaintiff's argument is meritless.

For all the above reasons, the Court concludes that the Agreement is clear, unambiguous, and binding. Under the terms of the Agreement, the Board is responsible for paying $27,500 for the school year 1991–92 for education and basic related services, related residential services, room and board, including physical therapy, occupational therapy, and speech and 90% of any increase in cost for these services. D.R.'s parents are responsible for paying the remaining 10% of any increase for these services and 100% for any and all other services, including the cost of the aide.

## 2. Rescission or Reformation of the Agreement

### A. Mutual Mistake

Plaintiff next asserts that because the services of a one-to-one aide were not contemplated at the time the Agreement was executed there was no meeting of the minds and it is tantamount to mutual mistake. Plaintiff's Brief at p. 10. Because both parties were mistaken at the time the Agreement was made, plaintiff submits, the Agreement is voidable.

The Court first finds it necessary to differentiate between a meeting of the minds and a mutual mistake. The meeting of the minds required to make a contract requires the parties to mutually agree and assent to the substance and terms of it. Black's Law Dictionary 886 (5th ed. 1979). It is elementary that a contract cannot be made when there has been no common understanding and mutual assent to the terms of a contract. *Driscoll v. State, Dept. of Treasury*, 265 N.J.Super. 503, 513, 627 A.2d

1167 (1993); *Knight v. New England Mutual Life Ins. Co.*, 220 N.J.Super. 560, 533 A.2d 55 (App.Div.1987). Mutual mistake presumes that the parties have had a meeting of the minds but that at the time of contract both assumed the same misconception as to a basic assumption. *See id.* at 920; *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 608–09, 560 A.2d 655 (1989); *Lampley v. Davis Machine Corp.*, 219 N.J.Super. 540, 549–550, 530 A.2d 1254 (App.Div.1987).

The facts of this case do not illustrate that there was any meeting of the minds on the subject of a one-to-one aide. The facts do not support the conclusion that D.R.'s parents were under the clear impression that the Agreement would require the Board to fund 90% of an aide and that the Board's impression was to the contrary. What they do demonstrate is neither party ever considered or discussed the item at the time the Agreement was entered. *See* Tr. 46:1–10. Likewise, there is no support for the conclusion that both parties were laboring under a common misconception.

As rescission or reformation of a settlement agreement is an extraordinary remedy which may be considered only upon demonstration by clear and convincing proof that the agreement was the result of *inter alia* mutual mistake or no meeting of the minds, and as the facts clearly show that this is not a case of mutual mistake or lack of mutual assent, the Court must find that the Agreement can not be voided.

### B. Rescission in Light of IDEA

Plaintiff contends that in light of *Woods v. N.J. Dept. of Education*, 796 F.Supp. 767 (D.N.J.1992), the Agreement is not binding on the parents. In *Woods*, as here, the parents of an educationally handicapped child entered into a stipulation of settlement with the local board of education. The settlement was approved by a hearing officer who determined that the settlement resolved all issues in the case. *Id.* at 770. Under the terms of the settlement, the school board agreed to pay for the educational portion of residential care for nine months, beyond that the board was absolved of such costs, and the parents agreed to make no further demands upon the board for residential services. *Id.* at 770 n. 1. The parents then pursued funding for the residential care portion of the school through various state agencies. *Id.* at 770. When this proved unsuccessful, the parents moved to reopen the matter with the school board and the other agencies. *Id.* at 771.

The school board moved for summary judgment in view of the settlement agreement. In denying the board's motion to dismiss, the district court focused on the board's responsibilities to provide a free and appropriate education. That is, the court apparently examined the settlement agreement in light of the statutory mandates of IDEA. While the *Woods* court did not delve into the specifics of IDEA and the school board's responsibility, the Court finds that it must supplement the *Woods* decision by making a brief digression to explain a school board's responsibilities and duties under IDEA.

■ IDEA provides a comprehensive handicapped educational plan. *See generally Board of Education v. Rowley*, 458 U.S. 176, 179–84, 102 S.Ct. 3034, 3037–39, 73 L.Ed.2d 690; *Oberti v. Board of Education*, 995 F.2d 1204, 1213 (3d Cir.1993). Originally enacted as the Education for All Handicapped Children Act in 1975, its goal is to ensure that disabled children receive appropriate educational services. *Oberti*, 995 F.2d at 1213 (citation omitted). IDEA provides federal assistance to participating states for the education of such special children. *B.G. by F.G. v. Cranford Bd. of Educ.*, 702 F.Supp. 1140, 1148 (D.N.J.1988), *aff'd*, 882 F.2d 510 (3d Cir.1989).[3] To receive funds, states must have "in effect a policy that assures all children with disabilities the right to a free appropriate public education." 20 U.S.C.A. § 1412(1).

■ The Supreme Court has held that a "free appropriate public education" consists of "educational instruction specially designed

---

**3.** New Jersey is a participating state, subject to the requirements of IDEA. *See Lascari v. Bd. of*

*Education*, 116 N.J. 30, 560 A.2d 1180 (1989).

to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188–189, 102 S.Ct. at 3042. The interstitial detail of IDEA is reserved for the states, who have the right to exceed the federal minimum standards and provide greater protection and services for handicapped children. *B.G.*, 702 F.Supp. at 1148. New Jersey has chosen to impose a higher standard of special education than the basic floor required by the Act. *Lascari*, 116 N.J. at 48, 560 A.2d 1180; *Geis v. Board of Education*, 774 F.2d 575, 583 (3d Cir.1985). As a result, in New Jersey, local school boards are required to provide educational services according to how the student can best achieve success in learning. *Id.* at 583.

Accordingly, the key issue in *Woods* was whether residential placement was educationally necessary under IDEA. The court concluded that the board of education has a duty under IDEA and state law to provide disabled students with a free appropriate public education, including funding both the education and residential portion of the placement. *Woods*, 796 F.Supp. at 776. Where it was educationally necessary but the board refused to "pay for the total costs of such placement", the board of education denied the student free and appropriate public education. *Id.* Because whether residential placement was educationally necessary and thus whether the board abdicated its duty were fact questions, summary judgement was denied. Additionally, and most importantly to the present matter, the court concluded that the existence of a settlement agreement did not bar an action against the school board demanding total funding of residential placement given the board of education's duty. *Id.* Hence, the *Woods* court found that notwithstanding a settlement agreement, the board was required to comply with the law.

■ While both parties contend that the issue here is one of construction of the Agreement—namely, to determine who is responsible for paying for the one-to-one aide—the Court believes that there is another issue which should also be addressed:

Whether the one-to-one aide is educationally necessary. *Id.* at 772–774; *Woods v. New Jersey Dep't of Education,* ("*Woods II*") 823 F.Supp. 254, 258 (D.N.J.1993). D.R.'s educational rights entitle him to a program and services that will permit him to best achieve his educational success. *B.G.*, 702 F.Supp. at 1156. Should it be determined that an aide is necessary in order to meet the standards of a free and appropriate education, a school board cannot discharge its duty by virtue of a settlement agreement. In light of *Woods,* a settlement agreement does not allow a school board to contract around or out of IDEA.

On the other hand, should it be determined that an aide is unnecessary, and thus that the school board is complying with the law, the Court will not allow parents of disabled students to ignore a settlement agreement with a view to constructing a new and better bargain. The Court concurs with the view espoused by defendants and the Administrative Law Judge: settlement agreements to a lawsuit usually form a contract between parties. *Nolan*, 120 N.J. at 472, 577 A.2d 143. Accordingly, the Court is sensitive to the possibility that a narrow reading of today's holding will tomorrow eliminate settlement agreements in special education cases.

In fact, plaintiff posits this exact argument. D.R. asserts that *Woods* allows parents of disabled children to virtually have carte blanche in disregarding settlement agreements. Plaintiff submits that *Woods* stands for the proposition that parents "always maintain[] a right to seek an appropriate education for their child and the board always has a duty to provide it. Thus the agreement [i]s no obstacle to a hearing on the current needs of the child." Plaintiff's Brief at 11.

■ The difference between plaintiff's contention and the Court's position is that the Court presumes that at the time the Agreement was entered, the services and/or program agreed to meet the child's educational needs and, therefore, was in compliance with IDEA. Starting with this presumption, parents do not have such an unabridged right. Parents indeed are barred from trying to change or modify a settlement

agreement merely because they find the terms unacceptable. But, parents do have the right to question whether a program delineated in a settlement agreement meets the requirements of IDEA if there has been a change in circumstances, such that the child's educational needs are no longer being met. To avoid reducing settlement agreements in special education cases to a nullity while trying to enforce the statutory requirement, the Court finds that the Agreement between D.R.'s parents and the Board is binding and shall not be set aside, unless it is found that the child's circumstances have changed, whereby enforcing the terms of the settlement would violate IDEA.

### 3. Res Judicata and the ALJ Decision of January 19, 1993

█ Pursuant to IDEA, failure to raise an issue at the administrative level will result in waiver of that issue on appeal to this Court. *Woods*, 796 F.Supp. at 775 (citations omitted). Notwithstanding the above reasoning, if D.R. did not raise the issue that D.R.'s condition had changed since the execution of the Agreement and therefore that the one-to-one aide was educationally necessary below, he is estopped now.

It appears that D.R. did raise the issue of educational necessity in his first Petition for Hearing. *See* Plaintiff's Brief, Appendix pp. 54–57, ¶ 5, 6, 10. While the first petition did not explicitly state there was a change in circumstances, it did request an order finding *inter alia* that an aide was necessary. *See id.* The Court assumes, without deciding, that this was sufficient to constitute a change in circumstances claim. D.R., though, clearly raised the issue of educational necessity. *Id.* ("D.R. requires the services of a 1 to 1 aide"; "D.R. is in need of the services ... [of an aide] in order to develop his potential to the fullest").

However, it also appears that D.R. never received the opportunity to be heard on these issues. When plaintiff attempted to raise these issues after the first hearing, he was barred and his petition was dismissed based on the doctrine of res judicata.

The doctrine of res judicata is well established. "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981) (citations omitted). The Court has long recognized that public policy requires that there be an end to litigation, those who have contested an issue shall be bound by the result of the contest, matters once tried shall be considered forever settled as between the parties. *Id.* at 401, 101 S.Ct. at 2429.

█ Application of the doctrine of res judicata requires the satisfaction of three elements: a final judgment on the merits in a prior suit, involving the same parties or their privies, and a subsequent suit based on the same claims. *Id.* at 399, 101 S.Ct. at 2428; *United States v. Athlone Indus. Inc.*, 746 F.2d 977, 983 (3d Cir.1984). The Court is satisfied that in the case at bar the third element is not established; strict application of the doctrine of res judicata requires that this action be remanded.

The first element required for preclusion under res judicata is a prior final judgment. In the case at bar, plaintiff's prior petition was dismissed on December 17, 1992, and as discussed *supra*, was a final resolution of the matter.

The second element of res judicata requires identity of parties. In his first petition D.R. named himself as plaintiff and the Board of Education as defendant. The second complaint names the identical plaintiff and defendant. Here, plaintiff has already sued the defendant, thus the prior favorable ruling is available for consideration under the doctrine of res judicata.

█ The final element for preclusion under the doctrine of res judicata is identity of the cause of action. The Court must consider four factors to determine when suits involve the same cause of action:

(1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions); (2) whether the theory of recovery is the same; (3) whether the witnesses and docu-

ments necessary at trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient to support the first); and (4) whether the *material* facts alleged are the same.

*Athlone,* 746 F.2d at 984 (emphasis in original, citations omitted). Searching the record in this case the Court finds that there is no identity of the causes of action for the theories of recovery are different and the witnesses and documents necessary at the hearing are not the same.

The theory for the first and only hearing concerned the validity of the agreement. The theory for the proposed second hearing was founded on IDEA's requirement for educationally necessity. If plaintiff had the opportunity at the first hearing to raise this second theory but for whatever reasons chose not to, then he would be precluded from raising it now. However, from the record before the Court, it appears that plaintiff pled educational necessity but did not have the opportunity to raise this issue as it was reserved due to the bifurcated approach the ALJ adopted. It would offend the concept of justice to preclude plaintiff from having his promised day in court to litigate this reserved issue.

Moreover, the witnesses and documents necessary at the educational necessity hearing are not the same as those that appeared at the first hearing. Given the procedural requirements for the IDEA as set forth in 20 U.S.C. § 1414 and state and federal regulations promulgated thereunder, *see* 34 C.F.R. § 300.340–300.349; N.J.A.C. 6.28–2.1–3.9, various experts would testify concerning D.R.'s academic needs with a view to assisting the ALJ in determining what was appropriate and in D.R.'s best interest. As the issue at the first hearing was construction of the Agreement, and not educational necessity, no experts testified concerning these areas.

The Court finds that given the above the ALJ decision of 1/19/93 was erroneous and that D.R. was not barred from obtaining a hearing on the necessity of a one-to-one aide if such a claim was properly raised by D.R.

and through no slumbering on his rights was not heard.

Accordingly, the Court remands this matter to the Office of Administrative Law to determine if D.R. properly raised this issue and whether he slumbered on his rights by not asserting this claim. If the Office of Administrative Law finds that D.R. satisfies those two conditions, then the Court directs the agency to hold a hearing on the educational necessity of the aide.

## CONCLUSION

It is clear that the Agreement is binding on the parties. As a matter of law, the Board is responsible for 90% of the increase in costs for the array of services which comprised the 1991–92 rate. As the aide is a new service not contemplated by the parties at the time the Agreement was entered, and as the Agreement explicitly relieves the Board from "any and all other costs" associated with Benedictine, plaintiff is required to bear the entire cost of the aide.

If this was a matter solely involving the construction of the Agreement, the Court would deny D.R.'s motion for summary judgment, but grant the Board's cross-motion. However, this action is also governed by IDEA which imposes upon the Board the obligation and responsibility to provide D.R. with a free appropriate public education.

The Court presumes that at the time it was entered, the Agreement reflected an educational program which met the statutory requirement. D.R. must overcome this presumption to void the Agreement. There must be a change in circumstances such that continued enforcement of the Agreement would violate D.R.'s educational rights.

The Court has no evidence to determine whether D.R.'s educational rights are being violated. Moreover, this is a fact-based inquiry. D.R.'s motion and the Board's cross-motion will be denied.

As the proper forum to adjudicate these issues is the Office of Administrative Law, the Court will administratively terminate the within action and will remand it to the Office of Administrative Law.

An appropriate order is attached.

**196**

### ORDER

It is on this 23 day of November, 1993

ORDERED that plaintiff's motion for summary judgment is denied; and it is further

ORDERED that defendant's cross-motion for summary judgment is denied; and it is further

ORDERED that this matter be remanded to the Office of Administrative Law for a hearing in conformity with this decision; and it is further

ORDERED that this matter is administratively terminated without prejudice.