Michael MARCANGELO, Plaintiff,

v.

BOARDWALK REGENCY CORPORATION, d/b/a Caesars Atlantic City, a/k/a Caesars Boardwalk Regency Hotel Casino, Defendant/Third Party Plaintiff,

v.

IGT, Third Party Defendant.

Civ. A. No. 93–4647 (JEI).

United States District Court,
D. New Jersey.

March 30, 1994.

McGlynn, Reed, Hense & Pecora by Kenneth M. Hense, Point Pleasant, NJ, Mahoney, Hawkes & Goldings by Morris M. Goldings, Sally A. Morris, Boston, MA, for plaintiff.

Clapp & Eisenberg, P.C. by John M. Donnelly, Jeffrey A. Grabowski, Atlantic City, NJ, for defendant/third party plaintiff.

Brown & Michael, P.C. by James J. Carroll, III, Guy S. Michael, for third-party defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

IRENAS, District Judge:

Plaintiff achieved a royal flush while playing a progressive slot machine located in the defendant's casino. However, because the order of the cards was the reverse of the "sequential royal flush" indicated on the machine's signage, the plaintiff received only $1046.31, the value of the secondary jackpot. This amount was substantially less than the primary "Pokermania" jackpot of $187,000. Plaintiff brought suit to recover the primary jackpot, alleging claims for breach of contract, fraud, and violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1 et seq. Defendant now moves for summary judgment pursuant to Fed.R.Civ.P. 56.

We find that a private cause of action in favor of casino patrons may not be implied from the Casino Control Act (the "Act"), N.J.S.A. 5:12–1 to –210, where the casino has complied fully with the applicable statutory and regulatory requirements. As to plaintiff's claims of a common-law cause of action for alleged inadequacies in machine signage, we find that such a cause of action, if it did exist, would be preempted by the express text of the Act. Finally, even if we were to recognize a common-law cause of action that was not preempted by the Act, plaintiff would be entitled only to (1) restitution of the amount by which the defendant was enriched ($1.25), or (2) the amount of damages necessary to make the plaintiff whole ($0.00). Summary judgment will therefore be granted in favor of the defendants.

## I. BACKGROUND

### A. *The Pokermania Slot Machine System*

Pokermania is a "multi-casino progressive slot machine game." Defendant's Brief in Support at 3. Pokermania slot machines are located in eight Atlantic City casinos. The machines are owned by third-party defendant International Gaming Technology ("IGT") and leased to the Atlantic City Pokermania Trust, comprising representatives from participating casinos, charged with responsibility for all jackpots won in the multi-casino Pokermania game. Affidavit of Paul Tjoumakaris at ¶ 2.[1]

Each Pokermania machine had a slot into which a patron could place one to five quarters. After placing the coins into the slot, the patron would press the "Deal" button, which would cause a computer chip within the machine to generate and display images of playing cards. A chart on the screen of the machine listed the various winning combinations and the corresponding payoffs.

The Pokermania system also provided for two progressive payoffs. A "sequential royal flush," defined on the face of the machine as the left to right sequence of 10, Jack, Queen, King, and Ace of a specified suit, would win the primary Pokermania progressive jackpot, known as the "Pokermania jackpot." Defendant's Brief in Support at 4. In addition, a "royal flush," defined as a combination of 10, Jack, Queen, King, and Ace, all of the same suit, in any order, would win a secondary jackpot known as "Mini–Mania." *Id.*

### B. *Approval of Pokermania*

In 1992, participants in the Atlantic City Star Poker Trust decided to convert to the Pokermania multi-casino progressive jackpot system, which differed from Star Poker in the following ways: the top hand was designated as "an ordered sequential royal flush in a selected suit in this order: 10, Jack, Queen, King, Ace"; two progressive jackpots were adopted, known as "Pokermania" and "Mini–Mania"; the game now used a five-column paytable with no joker; the machine supported a "Rowe bill collector"; the denomination was "hardcoded" to a quarter; and the "cashout light" would turn on only after credits had been won. Letter from William G. Foster, IGT, to Richard H. Williamson, New Jersey Division of Gaming Enforcement ("DGE") of 8/28/92.

---

1. Members of the Trust had formerly participated in a multi-casino progressive slot machine game known as Star Poker, also developed by IGT. At that time they were known as the Atlantic City Star Poker Trust, and their responsibilities centered on the payment of progressive jackpots won in Star Poker.

Proposals for the adoption of the Pokermania system were submitted by IGT, manufacturer of the system, to the New Jersey Division of Gaming Enforcement and to the Casino Control Commission for their approval. *See* N.J.S.A. 5:12–100(h) (requiring approval prior to use in the casino). The DGE submission detailed the differences from the Star Poker system and included printed listings of several of the computer files and copies of the signage.[2] The CCC submission contained such information as the number of progressive awards, the percentage payout, the rate of progression, the number and type of progressive control units. Both submissions included a copy of the "paytable," which listed winning combinations along with the maximum payouts for and the probability of each combination. Listed as the top winning combination was the "Royal Flush—Ordered," which a footnote to the table defined as "10 J Q K A—In a particular suit."

On September 10, 1992, the Division of Gaming Enforcement responded to IGT's request. DGE reported to the CCC that it "[did] not interpose an objection to the utilization of the [Pokermania] poker programs, character generator (CG1145) and color attribute prom (CAP(X)779)." Letter from Katherine A. Smith, DGE, to Hon. Steven P. Perskie, CCC of 9/10/92. However, the DGE did interpose an objection to the use of a bill changer in connection with the program, since that portion of the poker program had not fully satisfied the DGE's testing requirements. *Id.* On September 11, 1992, the CCC formally approved IGT's request to implement "the new poker programs, character

generator, and color attribute prom." Letter from Barbara A. Mattie, CCC, to Raymond D. Pike, IGT of 9/11/92.[3]

C. *The Instant Complaint*

On November 13, 1992, plaintiff Michael Marcangelo was playing a Pokermania slot machine, designated as "Asset Number 31814," in the defendant's Atlantic City casino. Plaintiff deposited five quarters into the machine and pressed the "Deal" button. After plaintiff discarded three of the cards and received three replacements, a royal flush—Ace, King, Queen, Jack, and 10 of hearts—appeared on the screen. Complaint at ¶ 4. The lights on the machine lit up and a slot machine attendant approached the plaintiff's machine. The attendant called for the manager, Mr. Brandt, who notified the plaintiff that he had won the "Mini–Mania" secondary jackpot.

Plaintiff filed an incident report with the casino, in which he contended that he had in fact won the primary progressive jackpot, then valued at $187,736.60.[4] Thereafter he filed a "Patron Complaint Report" with the CCC, wherein he repeated his contention that he had won the primary progressive jackpot and demanded "full payment." Patron Complaint Report of 11/23/92. A representative of CCC forwarded the complaint to Caesar's General Counsel, Robert E. Reilert, requesting an expanded narrative of the incident and suggesting informal resolution of the dispute. Reilert responded that the plaintiff's explanation was "as good as we can do," and that attempts at informal resolution

---

2. The signage included a "Pokermania" sign at the base of the machine, a second "Pokermania" sign above the screen that displayed the progressive payouts for a sequential royal flush of the specified suit and for a regular royal flush, and the following sign placed near the coin slot:

> Play 1 to 5 Coins
> Machine Pays to 1000 Coins
> All Other Wins Paid By Attendant
> *SEQUENTIAL [specified suit] ROYAL FLUSH (10, J, Q, K A)*
> *PROGRESSIVE JACKPOT PAID BY 20 EQUAL ANNUAL INSTALLMENTS*
> *FIRST INSTALLMENT PAID UPON VALIDATION OF WIN*
> Game Uses One 52 Card Deck

Affidavit of Leo Previti at Exh. D (emphasis added).

3. Confirmatory letters were sent the same day to Caesars Atlantic City and to counsel for Caesars and IGT. The CCC additionally requested that the Star Poker Trust be amended to provide that "the Star Poker trust presently has the authority and ability to operate the game of Pokermania, as well as to satisfy its existing obligations to the annuity winners and other creditors of Star Poker." Letter from Richard P. Franz, CCC, to John Donnelly and Guy S. Michael of 9/11/92. An amendment incorporating this request was forwarded to the CCC on November 6, 1992.

4. However, plaintiff did accept the sum of $1,046.31, the amount of the "Mini–Mania" jackpot.

would be fruitless, "as it looks like a lawsuit is coming." Note of Robert E. Reilert to Kenneth Doss, CCC of 11/25/92.

On October 18, 1993, plaintiff filed suit in the United States District Court for the District of New Jersey. Jurisdiction was premised on the diversity of the parties. The complaint alleged theories of recovery under breach of contract, fraud, and the New Jersey Consumer Fraud Act. On December 16, 1993, defendant filed an answer to the complaint, interposing, *inter alia*, the affirmative defenses of accord and satisfaction, failure to state a claim on which relief could be granted, and failure to join indispensable parties. On January 26, 1994, defendant filed a third-party complaint against IGT, the manufacturer of the Pokermania system, for indemnity and contribution.

On February 22, 1994, defendant filed the instant motion to dismiss, and in the alternative moved for summary judgment. Defendant maintains that the plaintiff's three theories of recovery "can all be distilled to one argument which is cast in several molds but retains its essence in each form: That the signage on the machine ... is improper because it is 'ambiguous' or difficult to read or because of the 'glittering lights,' and, therefore, it did not give 'fair notice of the rules.'" Defendant's Reply Brief at 2. It argues that plaintiff's suit is preempted by the Casino Control Act, which gives the CCC authority to approve machine signage. In the alternative, defendant argues that summary judgment should be granted in its favor because the plaintiff has failed to adduce evidence of fraud or breach of contract. Plaintiff responds that (1) the Casino Control Act does not regulate private disputes between parties; (2) he may properly bring suit in federal court; and (3) genuine issues of material fact exist which preclude summary judgment.

## II. LEGAL ANALYSIS

### A. *The Standard for Summary Judgment*

Under Fed.R.Civ.P. Rule 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

At the summary judgment stage, it is not the role of the judge to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party such that a reasonable jury could return a verdict for that party. *Id.* A non-moving party may not rest upon mere allegations, general denials, or vague statements. If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Bixler v. Central Penn. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Engineers,* 982 F.2d 884, 980–91 (3d Cir.1992).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Finally, summary judgment should be granted unless a dispute over a material fact is genuine, which the Court has defined as such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B. *A Cause of Action for Improper Signage*

While the complaint alleged several different theories of recovery, counsel for the plaintiff conceded at oral argument that the crux of each was that the signage on the face of the Pokermania machine was inadequate, in that it failed to give fair notice of the rules of the game. The issue thus presented is whether a casino patron may bring a cause of action against the casino based on alleged defects in the signage of the machine. Neither the Casino Control Act nor its implementing regulations expressly provide for

such an action. We must therefore determine (1) whether a private right of action may be implied from the Act or its regulations, (2) whether a common-law cause of action exists for inadequate or defective signage that is not preempted by the Casino Control Act, (3) if a cause of action exists, what would be the appropriate measure of damages.

### 1. An Implied Cause of Action

Defendant argues that since all aspects of a slot machine (program, odds, signage, etc.) must be pre-approved by the Casino Control Commission and the Division on Gaming Enforcement before installation of the machine on the casino floor,[5] such approval operates as a "safe harbor" from plaintiff's claims. Plaintiff responds that Commission approval does not shield defendant from liability for defective signage, and that actions for same may be maintained pursuant to the "fair notice" provisions of the Act and its implementing regulations.[6]

In essence, plaintiff seeks to imply a private right of action in favor of casino patrons under the "fair notice" provisions. As a general matter, "private causes of action are not ordinarily implied from regulatory enactments absent some indication of regulatory intent." *Tose v. Greate Bay Hotel & Casino, Inc.*, 819 F.Supp. 1312, 1317 n. 8 (D.N.J. 1993), *citing Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975); *Middlesex Cty. Sewerage Auth. v. National Sea Clammers Assoc.*, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622–23, 69 L.Ed.2d 435 (1981). No evidence of legislative intent to imply such a private cause of action has been presented, and our independent review of the statute

has found none. Nor is there any indication of the parameters of such a cause of action— applicable statute of limitations, measure of recovery, etc. In the face of such legislative inaction, we are loath to recognize a cause of action in favor of casino patrons.

In *Miller v. Zoby*, 250 N.J.Super. 568, 595 A.2d 1104 (App.Div.1991), the Appellate Division considered whether a casino's violations of the Act created a private cause of action for money damages in favor of a casino patron. The court found that the defendants had indeed violated statutes and regulations concerning the extension of credit to plaintiffs' decedent. It also determined that such violations had contributed to the decedent's gambling losses. 595 A.2d at 1106.

However, the court refused to recognize a private cause of action for the aggrieved patron:

From the existence of N.J.S.A. 5:12–127 and N.J.S.A. 5:12–101(f) we know that the Legislature was well aware of what to say when it desired to confer a private cause of action or a defense in civil matters as part of the regulatory machinery of the Casino Control Act. In other types of regulatory statutes, the Legislature has also expressly conferred private causes of action when it wanted members of the public to have access to the civil courts for violations of remedial statutes. [citations omitted] The fact that no general cause of action for violation of the credit provisions of the Act has been created is to us some reliable evidence that the Legislature neither intended to create such a cause of action by silence not desired the judiciary to create one by implication....

---

5. *See* N.J.S.A. 5:12–100(h):

No slot machine shall be used to conduct gaming unless it is identical in all electrical, mechanical and other aspects to a model thereof which has been specifically tested by the division and licensed for use by the commission. The commission shall, by regulation, establish such technical standards for licensure, including mechanical and electrical reliability, security against tampering, the comprehensibility of wagering, and noise and light levels, as it may deem necessary to protect the player from fraud or deception and to insure the integrity of gaming.... The commission shall, by regulation, determine the permissible

density of particular licensed slot machines or combinations thereof, based upon their size and light and noise levels, so as to create and maintain a gracious playing environment in the casino and to avoid deception or frequent distraction to players at gaming tables....

*Id.; see also* N.J.A.C. 19:45–1.37, 19:46–1.26 (containing regulations regarding signage).

6. *See, e.g.,* N.J.A.C. § 19:45–1.37(a)(4) (requiring each slot machine in a casino to have a "display on the front of the slot machine that provides fair notice of ... [t]he rules of play, character combinations which will award payouts, and the related payouts").

*Id.* 595 A.2d at 1108.[7] The court concluded that the "Legislature has provided only limited civil remedies in the Casino Control Act . . . and by implication we think no more than those established by the Act were intended." *Id.* 595 A.2d at 1110.[8]

The case for an implied cause of action under the Act is even weaker in the instant case, where the casino complied fully with the applicable statutory and regulatory requirements—including those concerning signage—before placing the Pokermania machines on the casino floor. Moreover, while *Miller* dealt only with credit regulations, with which the Commission would not be expected to have any special expertise, the case at bar deals with gaming regulations, which are at the heart of the Casino Control Act. *Miller*'s discussion of the significance of legislative inaction is even more meaningful here.

■ Reviewing the Casino Control Act and its regulations, we find no evidence of legislative intent to imply a cause of action in favor of patrons based on slot machine signage. We therefore decline to recognize an implied cause of action for inadequate or defective signage under the Casino Control Act, where (1) the signage has been approved by the Casino Control Commission pursuant to its statutory authority, (2) the signage is not obviously misleading, and (3) representatives from the DGE and the CCC are on hand in the casino during its hours of operation to receive and investigate complaints from casino patrons.[9] However, we leave open the question of whether such a cause of action could be implied where the signage had not been approved. *Cf. Decker v. Bally's Grand Hotel Casino,* No. A–2210–92T2, slip op. at 7 (N.J.Super.App.Div. Feb. 15, 1992) ("exclusive jurisdiction over [violations of the Administrative Code] clearly rests with the Commission and not with the courts").

### 2. A Cause of Action under the Common Law

#### a. The Type of Action

Plaintiff also contends that, irrespective of any actions which might be implied under the Act, he retains the right to bring suit for inadequate signage under common-law theories. Defendant responds that such theories, if any, are preempted by the express provisions of the Act.

Initially, we note several problems with discerning a common-law cause of action in this setting. As we recognized in an earlier opinion, "casino gambling, which only became legal in 1977, is an activity where the respective rights and obligations of the parties have regulated by the state and there is little freedom of contract in the usual sense, there seems to be at least significant doubt that the New Jersey Supreme Court would recognize obligations not specifically called for by the statute or regulations. It should also be noted that the creation of an [implied] cause of action raises collateral issues which are the proper function of the legislature and not the courts.

7. The *Miller* court also emphasized the pervasive regulatory structure within which the casinos operated:

> The casino industry is very closely and specifically regulated. The Supreme Court has called the statutory and administrative controls over casinos operations "extraordinarily pervasive and intensive." "Over 11 statutory articles and almost 200 separate provisions cover virtually every facet of casino gambling and its potential impact on the public." *Knight v. Margate,* 86 N.J. 374, 381, 431 A.2d 833 (1981).... A review of the "declaration of policy and legislative findings," N.J.S.A. 5:12–1, engender the conclusion that the Legislature intended that the casino industry be strictly "regulated and controlled pursuant to the provisions of this act," N.J.S.A. 5:12–1, subd. b(13), and not by a creatively-spirited judiciary.

> 595 A.2d at 1109.

8. *Cf. Tose v. Greate Bay Hotel & Casino, Inc.,* 819 F.Supp. at 817 n. 8.:

> [B]ecause every aspect of the relationship between the gambler and the casino is minutely

9. *See* N.J.S.A. 5:12–63(f):

> The Casino Control Commission shall have general responsibility for the implementation of this act, as hereinafter provided, including, without limitation, the responsibility:
> . . . .
> f. To be present through its inspectors and agents at all times during the operation of any casino for the purpose of certifying the revenue thereof, receiving complaints from the public, and conducting such other investigations into the conduct of the games and the maintenance of the equipment as from time to time the commission may deem necessary and proper. . . .

been articulated and developed by statutes and regulations, not by the common law." *Tose*, 819 F.Supp. at 1317 n. 8. It is therefore difficult to shoehorn gambling suits into traditional common-law areas, such as contract or tort. In the tort setting, for example, the fact that gambling has only been legalized for a comparatively short period of time, and in only a few places, leads to difficulties in defining the parameters of such basic tort concepts as duty, proximate cause, and comparative negligence.[10]

Application of traditional contract principles is also troublesome. While it is possible to conceive of the relationship between patron and casino in contractual terms,[11] it is a contract in which the terms are not left to the parties, but rather are completely determined by legislative enactment. That is, not only is there one agreement into which the parties can enter, but the terms of that agreement are completely predetermined by the Casino Control Commission pursuant to authority granted to it by the legislature.

### b. Preemption

■ Even were we to find a common-law cause of action for inadequate signage, we believe that such an action would be preempted by N.J.S.A. 5:12–133(b), which provides:

> If any provision of this act is inconsistent with, in conflict with, or contrary to any other provision of law, such provision of this act shall prevail over such other provision and such other provision shall be deemed to be amended, superseded or repealed to the extent of such inconsistency or conflict.... The commission shall have exclusive jurisdiction over all matters dele-

gated to it or within the scope of its powers under the provisions of this Act. N.J.S.A. 5:12–133(b). Clearly, the authority to determine the adequacy of machine signage is a matter entrusted to the CCC under N.J.S.A. 5:12–100(h), which allows to Commission to adopt regulations establishing "such technical standards ... as it may deem necessary to protect the player from fraud or deception and to insure the integrity of gaming." N.J.S.A. 5:12–100(h). Plaintiff's proposed common-law causes of action, if any, would therefore be preempted.

### c. The Measure of Recovery [12]

Even were we to recognize a common-law cause of action that was not preempted by the Act, the plaintiff would not be entitled to recover the difference between the primary and secondary progressive jackpots. If the facts of the case are viewed in terms of "no meeting of the minds" or a unilateral mistake, plaintiff would be permitted to void the contract and the parties would be returned to the *status quo ante*. The plaintiff would receive his $1.25 and would return to the defendant the $1046.31 it awarded him for realizing the Mini–Mania jackpot.

■ If, as plaintiff argues, the case is more properly viewed as one in which the agreement between the parties was induced by misrepresentation, plaintiff would only be entitled to receive damages sufficient to make him whole. Since defendant has already received full value for his investment, he would not recover additional damages.

### i. "No Meeting of the Minds"

"The meeting of the minds required to make a contract requires the parties to mu-

---

10. In this respect, plaintiff's case is qualitatively different from the negligence cases cited in his brief and at oral argument. Both the typical "slip and fall" case and the *G.N.O.C. Corp. v. Aboud*, 715 F.Supp. 644 (D.N.J.1989), line of cases involve areas traditionally left to the common law—the care of real estate, personal injuries, and automobile driving. Conversely, casino gambling is an area which has developed through statutes and regulations, with little attention paid to it by the common law.

11. The "contractual relationship" paradigm conceives of the relationship as a unilateral contract between the parties created by the placing and

acceptance of a bet, where of the terms of the contract are set forth by the CCC. *Cf. Decker v. Bally's Grand Hotel Casino*, No. A–2210–92T2, slip op. at 6 (N.J.Super.App.Div. Feb. 15, 1992) ("The plaintiff's only contract with any [casino] is the obligation of the [casino] to pay the posted machine jackpot to the plaintiff immediately after the plaintiff has inserted the requisite coinage if the deposit of coinage registers a jackpot on the particular machine then in use.").

12. In this section, for purposes of analysis, we construe the relationship between the parties in contractual terms.

tually agree and assent to the substance and terms of it.... It is elementary that a contract cannot be made when there has been no common understanding and mutual assent to the terms of a contract." *D.R. by M.R. v. East Brunswick Board of Educ.*, 838 F.Supp. 184, 191 (D.N.J.1993) (distinguishing meeting of the minds and mutual mistake), *citing Driscoll v. Dept. of Treasury*, 265 N.J.Super. 503, 513, 627 A.2d 1167 (L.Div. 1993); *Knight v. New England Mutual Life Ins. Co.*, 220 N.J.Super. 560, 533 A.2d 55 (App.Div.1987); *see also Restatement (Second) Contracts* § 17 cmt. c (1981) (discussing requirement of "meeting of the minds" or "manifestation of mutual assent"). If there is clear and convincing evidence that the alleged agreement was entered into without a meeting of the minds, it can be rescinded and the plaintiff awarded restitution in the amount by which the defendant has been enriched. *D.R. by M.R.*, 838 F.Supp. at 192.

■ If the instant case is viewed as one in which the plaintiff believed that the sequence listed on the sign above the coin slot (i.e., "10 J Q K A") was exemplary, while the defendant believed it to be exclusive, no meeting of the minds occurred. Upon rescission, the plaintiff would be entitled to restitution of the amount of money he put into the machine—$1.25—provided he returned the $1046.31 he received from the defendant. However, plaintiff would not be entitled to recover the amount of the primary progressive jackpot.[13]

### ii. Unilateral Mistake

■ We might also view the case as an instance of a unilateral mistake on the part of the plaintiff as to the rules of the game.

Section 153 of the *Restatement (Second) Contracts* provides that, in certain circumstances, such a contract may be voidable by the mistaken party.[14] However, the mistaken party would not be permitted to recover damages. *See generally Armco v. Glenfed Financial Corp.*, 720 F.Supp. 1129 (D.N.J. 1989); *Hamel v. Allstate Ins. Co.*, 233 N.J.Super. 502, 559 A.2d 455 (App.Div.1989). As with the "no meeting of the minds" scenario, plaintiff would be entitled to void the contract and obtain restitution in the amount of $1.25. However, plaintiff would also be required to return the money awarded him for winning the secondary progressive jackpot.

### iii. Misrepresentation

Plaintiff, understandably, does not seek to rescind the contract, but rather seeks to recover damages in the amount of the difference between the primary and secondary progressive jackpots. He argues that the contract between him and the defendant was induced by the latter's misrepresentations, and that he should therefore be able to recover the difference between the actual winnings and the winnings he claims he was led to expect.

■ Although we doubt that the record before us would support an inference that defendant was guilty of either deliberate or innocent misrepresentation,[15] even a finding of such conduct would not change the result. Where a party to a contract is guilty of misrepresentation, the contract is said to be voidable—but not void—and the victim is given the choice of affirming or rescinding the contract. *Restatement (Second) Contracts* §§ 7, 376, 384 (1981).

---

**13.** The instant case is not one of mutual mistake, which "presumes that the parties have had a meeting of the minds but that at the time of contract both assumed the same misconception as to a basic assumption." *D.R. by M.R. v. East Brunswick Board of Educ.*, 838 F.Supp. 184, 191–92 (D.N.J.1993) (citing cases); *see also Restatement (Second) Contracts* § 152 (1981).

**14.** *See Restatement (Second) Contracts* § 153 (1981):

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material

effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
a. the effect of the mistake is such the enforcement of the contract would be unconscionable, or
b. the other party had reason to know of the mistake or his fault caused by the mistake.

**15.** To the extent that plaintiff claims fraudulent inducement, he would be required to present clear and convincing evidence of same.

If the injured party chooses to rescind, "he must return what he received . . .," *Merchants Ind. Corp. v. Eggleston,* 37 N.J. 114, 130, 179 A.2d 505 (1962), but may be entitled to restitution in the amount by which the defrauding party has been enriched. If the injured party chooses to affirm, he may keep the consideration received and may receive such damages as are required to make the victim whole. As noted in *Correa v. Maggiore,* 196 N.J.Super. 273, 482 A.2d 192, 197–198 (App.Div.1984), "[t]he appropriate measure of damages in a fraud or concealment case is a perplexing problem and has been the source of much litigation and concern." However, the specific rule selected to measure damages "must be subordinated to the basic objective of making the injured party whole." *Id.* (citing *525 Main St. Corp. v. Eagle Roofing Co.,* 34 N.J. 251, 254, 168 A.2d 33 (1961)); *see also Baldasarre v. Butler,* 254 N.J.Super. 502, 524, 604 A.2d 112 (App.Div.1992) (same), *aff'd in part, rev'd in part on other grounds,* 132 N.J. 278, 625 A.2d 458 (1993).

Although in certain cases it may be appropriate to award a plaintiff damages based on "the difference between the price paid and the value of the property had the representations been true,"[16] the award of damages should not be computed so as to allow the plaintiff to "enjoy a windfall." *Correa,* 482 A.2d at 197.

Even if plaintiff was deceived into believing that there was more than one winning combination on the poker machine, the payoffs approved by the Casino Control Commission were based on only one winning sequence. That is, although plaintiff may have been deceived, he received full value for his investment. Nor was it a bad investment, since it netted him over $1,000 for five quarters. Thus, treating plaintiff as one who is affirming a voidable contract, no additional damages would be required to make the plaintiff whole, while awarding such damages would operate as a windfall.

In this respect, the instant case is similar to *Correa v. Maggiore.* The defendant in that case grossly misrepresented the condition of the home he sold to the plaintiff. The trial court found that the appropriate measure of recovery would be the cost of the repairs necessary to put the house in the condition represented by the defendant-seller. The Appellate Division reversed, finding that the trial court's award would place the plaintiff "in a pecuniary position far better than that for which she bargained," 482 A.2d at 197, thereby affording her an undeserved windfall. Instead, the Appellate Division found that a fair measure of damages to compensate the plaintiff would be the difference between the actual value of the house and the purchase price. *Id.* at 198.

If a con artist sells metal bars for $7.00 an ounce by telling prospective customers that the bar is made of gold, when it is in fact made of silver, there is a clear misrepresentation. The defrauded buyer can choose to keep the bar or ask for a return of the $7.00. However, if silver is selling at $7.00 an ounce, and gold for $390.00 an ounce, it would create an inequitable windfall to give the buyer damages measured by the difference between the price of gold and the price of silver, since the buyer received equivalent value for the purchase price.

Plaintiff in the instant case purchased the casino equivalent of a silver bar and paid a fair price for the silver bar. Even if he was misled into believing that he had purchased casino gold, his choices would be either to keep the silver (his $1,046.31 Mini–Mania secondary jackpot) or to give it back and receive in return his original investment of $1.25. He would not be entitled to recover the value of the casino gold—in this case, the value of the Pokermania primary jackpot.

## III. CONCLUSION

We decline to recognize an implied cause of action in favor of casino patrons under the Casino Control Act absence evidence of legislative intent. As to plaintiff's claims for a common-law cause of action for inadequate machine signage, we find that any such cause of action would be preempted by the express text of the Act. Finally, even if we were to

---

16. Such would be a fair measure of damages, for instance, where the price paid by the plaintiff is equivalent to value as represented, but not to the actual value.

**1232**

recognize a cause of action that was not preempted, plaintiff would not be entitled to recover the difference between the primary and secondary progressive jackpots. Since plaintiff is not entitled to compensation over and above the award he received from the casino, summary judgment will be entered in favor of the defendant. Also, because our decision to grant the defendant's motion for summary judgment renders the third-party complaint moot, it too shall be dismissed.

For the reasons set forth above,

**IT IS** on this *30th* day of March, 1994,

**ORDERED THAT**

1. The defendant's motion for summary judgment is hereby **GRANTED**; and

2. The third-party complaint is hereby **DISMISSED** as moot.